# United States Court of Appeals for the Federal Circuit

06-5012

COLVIN CATTLE COMPANY, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Michael J. Van Zandt, McQuaid Bedford & Van Zandt LLP, of San Francisco, California, argued for plaintiff-appellant. With him on the brief was Lyman D. Bedford.

Katherine J. Barton, Attorney, Environment and Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Sue Ellen Wooldridge, Assistant Attorney General, Kathryne E. Kovacs, and Kathleen L. Doster, Attorneys.

John Echeverria, Georgetown Environmental Law & Policy Institute, of Washington, DC, for Amicus Curiae.

Appealed from: United States Court of Federal Claims

Senior Judge John P. Wiese

# United States Court of Appeals for the Federal Circuit

06-5012

COLVIN CATTLE COMPANY, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

---

DECIDED: November 1, 2006

---

Before NEWMAN, MAYER, and RADER, Circuit Judges.

MAYER, Circuit Judge.

Colvin Cattle Company, Inc. ("Colvin") appeals the judgment of the United States Court of Federal Claims, which dismissed its complaint alleging takings of its water rights and ranching operations, breach of contract, and other injuries. Colvin Cattle Co., Inc. v. United States, 67 Fed. Cl. 568 (2005). We affirm.

## Background

Colvin owns a 520-acre cattle ranch in Nevada, adjacent to the Montezuma Allotment. The allotment comprises 625,000 acres of public land in Nevada, and the Bureau of Land Management ("BLM") administers cattle grazing on it pursuant to the

1934 Taylor Grazing Act ("TGA"), 43 U.S.C. § 315 et seq. The land was initially conferred on the United States in 1848 through the Treaty of Guadalupe Hidalgo, and it has remained in the federal government's possession ever since. Colvin alleges, and the government does not contest, that it possesses stockwatering rights in the allotment.

Colvin first applied to the BLM for a grazing lease in 1969, which was granted on January 19, 1970. The lease was last renewed in 1989, for a term of ten years, but it remained effective only upon Colvin making the requisite annual payments. By its terms, it conveyed "no right, title or interest held by the United States in any lands or resources."[1] In February 1995, Colvin failed to pay the $966 annual grazing fee. As a result of that failure, the BLM issued Colvin a trespass notice on March 15, 1995, demanding that it stop grazing its cattle on the allotment. Ultimately, in 1997, Colvin's lease was canceled and trespass damages were assessed against it.

However, Colvin continued to graze on the allotment, and on June 25, 2001, the BLM issued a notice of intent to have its cattle removed. Moreover, in May 2002, the BLM canceled Colvin's range improvement permits, and issued an initial decision ordering that all materials related to range improvements be removed. Colvin did not

---

[1] The lease specifically provides:

> This lease; 1. Conveys no right, title or interest held by the United States in any lands or resources and 2. Is subject to (a) modifications, suspension or cancellation as required by land plans and applicable law; (b) annual review and to modification of terms and conditions as appropriate; and (c) the Taylor Grazing Act, as amended, the Federal Land Policy and Management Act, as amended, the Public Rangelands Improvement Act, and the rules and regulations now or hereafter promulgated thereunder by the Secretary of the Interior.

respond, and the BLM issued a final decision on the matter on November 26, 2003, ordering all range improvements removed, excluding any “facilities necessary for exercise of water rights . . . established pursuant to Nevada law.” Colvin Cattle, 67 Fed. Cl. at 570. Although Colvin may no longer access the allotment for grazing purposes, the government has not impeded its access to water. The BLM has since authorized another rancher to graze livestock, but as a condition of his authorization, he must haul his own water to the allotment.

On August 18, 2003, Colvin filed suit in the Court of Federal Claims, asserting takings claims relating to its water rights and ranching operations, a breach of contract claim relating to its canceled grazing lease, and a claim for compensation under 43 U.S.C. § 1752(g) for the value of improvements made to the allotment. The government moved to dismiss for failure to state a claim or, in the alternative, for summary judgment. The trial court ruled in favor of the United States on all issues, and dismissed Colvin’s complaint. Colvin appeals, and we have jurisdiction under 28 U.S.C. § 1295(a)(3).

## Discussion

Preliminarily, because the trial court relied on matters outside of the pleadings in dismissing Colvin’s complaint and Colvin was given a reasonable opportunity to present materials relevant to the government’s motion, we treat the trial court’s dismissal as a grant of summary judgment in favor of the United States. Fed. R. Civ. P. 12(b); see also Moden v. United States, 404 F.3d 1335 (Fed. Cir. 2005). Summary judgment is appropriate “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.”

Fed. R. Civ. P. 56(c). As such, we review the trial court's judgment de novo, drawing all reasonable factual interferences in favor of Colvin. Crater Corp. v. Lucent Techs., Inc., 255 F.3d 1361, 1366 (Fed. Cir. 2001). Applying this standard, we reject each of its arguments.

We begin with Colvin's takings claims. Its principal contention is that the United States' actions restricting its ability to graze on the Montezuma Allotment constitute a taking of its water rights. It does not allege that it possesses a free-standing right to graze. Rather it says merely that such a right is inherent in its water rights, and therefore, interfering with its ability to graze constitutes a taking of its water rights. Colvin Cattle, 67 Fed. Cl. at 570. Accordingly, if no such inherent grazing right exists, then governmental actions restricting its ability to graze do not implicate Colvin's water rights in any constitutionally protected manner, and cannot constitute a taking.

Indeed, under our regulatory takings analysis, see, e.g., M & J Coal Co. v. United States, 47 F.3d 1148, 1153-54 (Fed. Cir. 1995), the threshold inquiry is "whether the claimant has established a 'property interest' for purposes of the Fifth Amendment," Conti v. United States, 291 F.3d 1334, 1339 (Fed. Cir. 2002) (citations omitted). In other words, the relevant question is whether Colvin's alleged grazing interest is a stick in the bundle of rights it has acquired in the Montezuma Allotment, see M & J Coal, 47 F.3d at 1154 (citing Lucas v. S.C. Coast Council, 505 U.S. 1003, 1027 (1992)): do Colvin's water rights contain an appurtenant grazing right? In deciding this question, we do not rely on the Constitution alone because it "neither creates nor defines the scope of property interests compensable under the Fifth Amendment." Maritrans Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003) (citations omitted). We also look to "'existing rules and understandings' and 'background principles' derived from an

independent source, such as state, federal, or common law, [to] define the dimensions of the requisite property rights for purposes of establishing a cognizable taking." Id. (citing Lucas, 505 U.S. at 1030).

Turning to the question at hand, the Constitution provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. As such, "[t]he United States can prohibit absolutely or fix the terms on which its property may be used." Light v. United States, 220 U.S. 535, 536 (1911). Because the Montezuma Allotment has been the continuous property of the United States since 1848, it has always been subject to the Property Clause. Under that clause, Congress enacted the TGA, authorizing the Secretary of the Interior to create grazing districts on federal public lands and to issue grazing leases and permits upon the payment of an annual fee. TGA §§ 315, 315b. As both parties concede, the TGA itself does not confer any grazing rights on private parties. Because the vesting of any property right to graze on public lands subsequent to the enactment of the TGA would be inconsistent with the act, any grazing right that Colvin possesses necessarily must have vested prior to its enactment.

However, prior to the TGA, grazing on federal public lands was done at the United States' sufferance. See Light, 220 U.S. at 535. It was, and remains, a privilege, not a right. See Omaechevarria v. Idaho, 246 U.S. 343, 352 (1918) ("Congress has not conferred upon citizens the right to graze stock upon the public lands. The Government has merely suffered the lands to be so used."). As such, the pre-TGA "implied license" that these lands could be used for grazing was left open only "so long as the Government did not cancel its tacit consent." Light, 220 U.S. at 535 (citing Buford v.

Houtz, 133 U.S. 320, 326 (1890)). "Its failure to object [to pre-TGA grazing] . . . did not confer any vested right . . . , nor did it deprive the United States of the power of recalling any implied license under which the land had been used for private purposes." Id. (citations omitted). Accordingly, any water right that Colvin or its predecessors obtained could not and did not include an attendant right to graze on public lands.

Colvin's reliance on Nevada law to establish the contrary proposition fails. Its argument begins well enough by stating that under the Mining Act of 1866, 43 U.S.C. § 661,[2] and the TGA, 43 U.S.C. § 315b,[3] the United States recognizes vested state law-based water rights. It runs into trouble, however, when it asserts that under Nevada law "a stockwatering right has always included the right to graze." Pet. Br. at 29. To support this proposition, Colvin cites the 1925 Nevada Stockwatering Act, Nev. Rev. Stat. §§ 533.485-533.510 ("Stockwatering Act"). Yet, nothing in the Stockwatering Act or Nevada Supreme Court interpretations of it establishes any such right.

---

[2] The Mining Act of 1866 provides in pertinent part:

> Wherever, by priority of possession, rights to the use of water for mining, argiculture, manufacturing, or other purposes have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same . . . .

43 U.S.C. § 661 (2000).

[3] The TGA provides in pertinent part:

> [N]othing in this subchapter shall be construed or administered in any way to diminish or impair any right to the possession and use of water for mining, agriculture, manufacturing, or other purposes which has heretofore vested or accrued under existing law validly affecting the public lands or which may be hereafter initiated or acquired and maintained in accordance with such law.

43 U.S.C. § 315b (2000).

In In re Calvo, 253 P. 671, 675 (Nev. 1927), the Nevada Supreme Court stated: "The state is not asserting any right or title to the public domain under the [1925 Stockwatering Act]. All that the state seeks to do pursuant to the statute is to exercise police regulations over the public domain. . . . Furthermore any time the federal government conveys title to any portion of the public domain in this state, or in any other manner undertakes to exercise control over it, the statute in question becomes inoperative in so far as it conflicts with the authority of the federal government." In Itcaina v. Marble, 55 P.2d 625, 629-30 (Nev. 1936), it further clarified: "No property right can be acquired by [grazing livestock upon the public domain]. All persons so using the public domain do it merely by sufferance of the federal government . . . . This use is often alluded to as a right. It is not a right that the government of the United States has conferred, and these public range lands may at any time be withdrawn from such use."

Moreover, the Stockwatering Act could not have conferred such a right, even if it had tried. Because the Montezuma Allotment is and always has been federal land, no right in it may be obtained without congressional authorization. See U.S. Const. art. IV, § 3, cl. 2.; see also Kleppe v. New Mexico, 426 U.S. 529, 539-40 (1976). Ansolabehere v. Laborde, 310 P.2d 842, 842 (Nev. 1957), recognizes as much in holding that to the extent the Stockwatering Act purported to "govern[] the grazing use of the public lands [it was] superseded and rendered ineffective by the enactment by Congress of what is known as the Taylor Grazing Act." Therefore, because Colvin's water rights do not have an attendant right to graze, no governmental action restricting Colvin's ability to graze on federal land can affect its water right in a manner cognizable under the Fifth Amendment.

Colvin's argument that grazing is the only beneficial use for which it may exercise its water rights is to no avail. Even if we accept as true that its water rights are rendered sufficiently without value as to satisfy the second prong of M & J Coal, 47 F.3d at 1153-54 (Fed. Cir. 1995) (setting forth the nature of the loss that is necessary to constitute a taking), its claim fails because, under the first prong, grazing is not a stick in the bundle of rights that it has ever acquired, id. at 1154 (citing Lucas, 505 U.S. at 1027).

Colvin's related claim for a taking of its ranch also fails. That the ranch may have lost value by virtue of losing the grazing lease is of no moment because such loss in value has not occurred by virtue of governmental restrictions on a constitutionally cognizable property interest. See also United States v. Fuller, 409 U.S. 488, 493 (1973) (holding that "the Fifth Amendment does not require the Government to pay for that element of value based on the use of respondents' fee lands in combination with the Government's permit lands").

Next, Colvin's argument that the government's alleged failure to prevent the successor to its lease and wild horses from infringing on its water rights constitutes a taking, is also without merit. The government has required Colvin's successor to provide his own water for his cattle, and, more importantly, the United States cannot be held responsible for the incursion on water rights by a private party. See Alves v. United States, 133 F.3d 1454, 1458 (Fed. Cir. 1998) ("There clearly can be no taking when whatever acts complained of are those of private parties.") (citing 767 Third Ave. Assocs. v. United States, 48 F.3d 1575, 1580 (Fed. Cir. 1995)). And because wild horses are outside the government's control, they cannot constitute an instrumentality of the government capable of giving rise to a taking. See id. at 1457-58 (citing Mountain States Legal Found. v. Hodel, 799 F.2d 1423 (10th Cir. 1986) (en banc)); see also

Douglas v. Seacoast Prods., Inc., 431 U.S. 265, 284 (1977) ("[I]t is pure fantasy to talk of 'owning' wild fish, birds, or animals. Neither the States nor the Federal Government . . . has title to these creatures until they are reduced to possession by skillful capture.") (citations omitted); Kleppe, 426 U.S. at 535-38.

Colvin next argues that the government's actions leading up to its decision to stop making annual lease payments constitute a breach of contract. However, even if a breach of contract suit could properly be brought under a grazing lease, Colvin's failure to pay occurred in February 1995, and, therefore, any governmental acts giving rise to such a claim necessarily occurred before that time. Because Colvin did not file suit until August 2003, its breach of contract claim is barred by the Tucker Act's six year statute of limitations, 28 U.S.C. § 2501. The trial court dismissed Colvin's claim on the merits; we affirm the dismissal, but do so for lack of jurisdiction. See John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1354 (Fed. Cir. 2006).

Finally, Colvin seeks compensation under 43 U.S.C. § 1752(g)[4] for the value of improvements made to the grazing area. However, even if such a claim may properly be raised here, it did not request a determination by the Secretary of the value of its improvements as required by the statute. Cf. Julius Goldman's Egg City v. United States, 556 F.2d 1096, 1099 (Ct. Cl. 1977) (holding that where the statute in question

---

[4] 43 U.S.C. § 1752(g) provides in pertinent part:

> Whenever a permit or lease for grazing domestic livestock is canceled in whole or in part, in order to devote the lands covered by the permit or lease to another public purpose, including disposal, the permittee or lessee shall receive from the United States a reasonable compensation for the adjusted value, to be determined by the Secretary concerned, of his interest in authorized permanent improvements placed or constructed by the permittee or lessee on lands covered by such permit or lease . . . .

(emphasis added).

required that "the measure of fair market value shall be 'as determined by the Secretary.' . . . the court cannot substitute its own discretion for properly exercised administrative discretion."). Therefore, its claim is not ripe for failure to exhaust administrative remedies. Here again, the trial court dismissed Colvin's claim on the merits; we affirm, but for lack of jurisdiction.

## Conclusion

Accordingly, the judgment of the United States Court of Federal Claims is affirmed.

## AFFIRMED