**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| THE ESTATE OF E. WAYNE HAGE AND THE ESTATE OF JEAN N. HAGE,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No.91-1470L<br><br>Senior Judge Loren Smith |

**DEFENDANT'S NOTICE OF SUPPLEMENTAL AUTHORITY**

Defendant hereby provides notice to the Court of supplemental authority, Walker v. United States, No. 29,544 (N.M. Sup. Ct. June 21, 2007) ("Opinion"), in which the New Mexico Supreme Court answered the following two questions, certified by the United States Court of Federal Claims, in the negative: (1) Does the law of the State of New Mexico recognize a limited forage right implicit in a vested water right?; and (2) Does the law of the State of New Mexico recognize a limited forage right implicit in a right-of-way for the maintenance and enjoyment of a vested water right?

Defendant notifies the Court of this opinion because of its relevance to the question of whether plaintiffs possess a compensable property interest, which is a necessary antecedent to resolution of the 2004 trial in this case. A copy of the Opinion is attached.

Dated: June 29, 2007

Respectfully submitted,

RONALD J. TENPAS
Acting Assistant Attorney General
Environment & Natural Resources Division

/s/ Kathleen L. Doster

Kathleen L. Doster
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
(202) 305-0481 (phone)
(202) 305-0506 (fax)
kathleen.doster@usdoj.gov

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing **DEFENDANT'S NOTICE OF SUPPLEMENTAL AUTHORITY** has been served by first class mail on this 29th day of June, 2007, to the following interested parties:

Michael Wolz
Nevada Attorney General's Office
100 North Carson Street
Carson City, NV 89701-4717

by first class mail

Thomas D. Lustig
National Wildlife Federation
2260 Baseline Rd. Ste. 100
Boulder, CO 80302

by first class mail

Stephanie Ore-Brooks
Stephanie Ore-Brooks

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number:

Filing Date:

SUPREME COURT OF NEW MEXICO
FILED
JUN 21 2007

**NO. 29,544**

**ROY WALKER and SHELLIE WALKER,**

Plaintiffs,

v.

**UNITED STATES,**

Defendant.

**CERTIFICATION FROM THE UNITED STATES COURT OF FEDERAL CLAIMS**
**Susan G. Braden, United States Court of Federal Claims Judge**

Montgomery & Andrews, P.A
John Benbow Draper
Santa Fe, NM

McQuiad, Bedford & Van Zandt, L.L.P.
Lyman Daniel Bedford
Michael J. Van Zandt
San Francisco, CA

for Plaintiffs

Office of the U.S. Attorney
John W. Zavitz
Albuquerque, NM

U.S. Department of Justice
Environment & Natural Resources Division
Kathryn E. Kovacs
Washington, DC

for Defendant

New Mexico Environmental Law Center
Eric Jantz
Santa Fe, NM

Georgetown Environmental Law & Policy Institute
John Echeverria
Washington, DC

College of Law, Arizona State University
Joseph Feller
Tempe, AZ

National Wildlife Federation
Thomas D. Lustig
Boulder, CO

for Amici Curiae
New Mexico Wildlife Federation, New Mexico Council of Trout Unlimited, and The National Wildlife Federation

Law Offices of Ted J. Trujillo
Ted J. Trujillo
Adan E. Trujillo
Espanola, NM

for Amicus Curiae
Northern New Mexico Stockman's Association

Scott & Kienzle, P.A.
Paul M. Kienzle, III
Albuquerque, NM

for Amicus Curiae
Paragon Foundation, Inc.

Daniel A. Bryant, P.A.
Daniel A. Bryant
Ruidoso, NM

for Amici Curiae
Otero County and the Arizona New Mexico Coalition of Counties

Office of the State Engineer
D.L. Sanders, Special Assistant Attorney General
R. Bruce Frederick, Special Assistant Attorney General
Santa Fe, NM

for Amicus Curiae
John R. D'Antonio, Jr., New Mexico State Engineer

Hubert & Hernandez, P.A.
Lee E. Peters
Las Cruces, NM

for Amici Curiae
New Mexico Cattle Growers' Association, New Mexico Farm and Livestock Bureau, New Mexico Federal Lands Council, and Fee and Public Land Association

David A. Garcia, L.L.C
David A. Garcia
Albuquerque, NM

Mountain States Legal Foundation
Joshua D. McMahon
Lakewood, CO

for Amicus Curiae
Mountain States Legal Foundation

# OPINION

**BOSSON, Justice.**

{1} We are asked to answer two questions certified to us by the United States Court of Federal Claims, pursuant to Rule 12-607 NMRA:

> 1. Does the law of the State of New Mexico recognize a limited forage right implicit in a vested water right?
> 2. Does the law of the State of New Mexico recognize a limited forage right implicit in a right-of-way for the maintenance and enjoyment of a vested water right?

We answer both questions in the negative.

## BACKGROUND

{2} The Walkers own a forty-acre cattle ranch in southwestern New Mexico.[1] *Walker v. United States*, 66 Fed. Cl. 57, 57-58 (2005) (*Walker I*). This ranch serves as the base property for two adjacent grazing allotments, covering 17,826 acres in the Gila National Forest, administered by the United States Forest Service (the Forest Service). *Walker v. United States*, 69 Fed. Cl. 222, 224 (2005) (*Walker II*). Until recently, the Walkers were allowed use of the allotments through the Forest Service permitting process. The most recent permit issued on March 23, 1995, and allowed 265 head of cattle and 8 head of horses to graze throughout the year for a ten-year period. *Walker I*, 66 Fed. Cl. at 58.

{3} In April 1996, the Forest Service conducted inspections of the allotments in

---

[1]Having no Record in this case, the facts are taken from the underlying federal case of *Walker v. United States*, 66 Fed. Cl. 57 (2005) (*Walker I*), and the Certification Order, *Walker v. United States*, 69 Fed. Cl. 222 (2005) (*Walker II*).

response to complaints of sick and dying cattle. *Id.* Based on these inspections, the Forest Service determined that drought conditions and overgrazing had "decimated" the grass and pasture on the allotments. *Id.* The Forest Service then instructed the Walkers to remove cattle incrementally from the allotments to encourage recovery of the pastures. *Id.* at 58-59. After cooperating initially, the Walkers began disputing the Forest Service's authority over the allotments and refused to remove their cattle. *Id.* at 59-60.

{4} In October and November 1996, the Forest Service canceled both of the Walkers' grazing permits. *Id.* at 60. The Walkers continued to graze, asserting that they owned the surface rights on the allotments and did not need a permit to graze. *Id.* at 59-60. In May 1997, the United States brought a trespass action against the Walkers. *Walker II*, 69 Fed. Cl. at 224. The United States District Court for the District of New Mexico determined that the Walkers did not have a fee interest in the surface estate of the allotments, and ordered the Walkers to remove their cattle from the allotments, which they eventually did. *See Walker I*, 66 Fed. Cl. at 61; *Walker II*, 69 Fed. Cl. at 225.

{5} The Walkers subsequently filed a complaint in the United States Court of Federal Claims (Court of Claims), arguing that the United States had violated the Just Compensation Clause of the Fifth Amendment to the United States Constitution by revoking their grazing permits without compensating the Walkers for their alleged property interests. *Walker I*, 66 Fed. Cl. at 61; *see* U.S. Const. amend. V ("[P]rivate

property [shall not] be taken for public use, without just compensation."). Having failed to convince the federal district court of their purported fee interest in the surface estate of the allotments under federal law, the Walkers then asserted a property right under New Mexico state law which had been taken and for which they claimed just compensation. Specifically, the Walkers argued that the revocation of the federal permit resulted in the loss of "water, forage, and grazing" rights based on New Mexico state law, depriving them of all economically viable use of the ranch. *Walker I*, 66 Fed. Cl. at 61-62. They sought $10,000,000 in compensation from the federal government. *Id.* at 62.

{6} In examining the Walkers' takings claim, the Court of Claims concluded that New Mexico state law determines the nature of any alleged property interests taken by the federal government. *Walker II*, 69 Fed. Cl. at 227. The Court of Claims observed that in New Mexico water rights are an interest separate from ownership of the associated surface estate. *Id.* at 230 (citing *KRM, Inc. v. Caviness*, 1996-NMCA-103, ¶ 6, 122 N.M. 389, 925 P.2d 9). The Court of Claims also noted that New Mexico recognizes a "right of way" interest for the maintenance and enjoyment of a valid water right. *Id.* at 231 (citing *First State Bank of Alamogordo v. McNew*, 33 N.M. 414, 437, 269 P. 56, 66 (1928)). However, the Court of Claims ultimately determined that the laws of this state are silent on whether the Walkers had a purported "forage right" for their cattle incident to their ownership of a water right or implicit in a ditch right-of-way for the maintenance and enjoyment of a

vested water right. *Id.* at 231-32. Certification to this Court followed, and we now address the "forage right" question as a matter of state law. *Id.* at 232-33.

**DISCUSSION**

**I. Does the Law of the State of New Mexico Recognize a Limited Forage Right for Livestock Implicit in a Vested Water Right Historically Used for Stock Watering?**

{7} As an initial matter, we note that we do not decide whether the Walkers actually have a valid water right, or whether they are entitled to compensation for any alleged taking of such a water right. That matter is not before us, and for the purpose of deciding the certified questions, we assume, without deciding, that the Walkers do have a valid water right as they claim.[2] As stated earlier, it is also clear that the Walkers do not have any property rights under federal law to the surface estate of the allotments.

{8} The question we must answer is whether the Walkers have a property right cognizable under state law as incident to that water right to use the surface estate of the allotments for forage. To make this claim, the Walkers trace a connection between their

[2]There is a serious dispute whether the Walkers have any valid water rights because the water on the allotments is part of the Mimbres River Stream System and the Mimbres Underground Water Basin, both of which have been fully and finally adjudicated by the New Mexico courts. *See Mimbres Valley Irrigation Co. v. Salopek*, D-619-CV-66006326 (6th Jud. D.Ct. Jan. 14, 1993). According to the United States, all of the water on the allotments has been adjudicated to the Forest Service, not the Walkers or their predecessors in interest. While this is an important issue, the Court of Claims has made it clear that our answers to these certified questions may have jurisdictional implications, and thus it is important for us to submit our answers before the federal court takes on these other issues. *Walker v. United States*, 72 Fed. Cl. 186, 187 (2006) (*Walker III*).

water right and an alleged property right in the surface estate. Specifically, the Walkers assert that their vested water right, historically used to water cattle, entitled their predecessors in interest and now entitles them, to the implicit use of the surrounding land as forage for that livestock.

{9} The Walkers' argument is two-fold. First, they assert that their right to forage when utilizing a water right was established under the customary practice of Spain, Mexico, and the New Mexico Territory, which rights were then confirmed under the Mining Act of 1866. Second, the Walkers argue that the laws of New Mexico also recognize a limited forage right implicit in a water right. We address the Walkers' arguments in reverse order, focusing first on current New Mexico law before addressing customary practice at the end of this opinion.

{10} The Walkers' state law argument can be broken down into three parts: (1) the state law requirement that a water right must be put to beneficial use to avoid abandonment; (2) a specific state statute of ancient origin, NMSA 1978, § 19-3-13 (1953); and (3) New Mexico case law, both past and present. The Walkers weave together these sources of New Mexico law to support their claim to a forage right on federal land incident to their state water right.

{11} In arguing for a property right to forage, the Walkers focus on the interplay of the beneficial use requirement with Section 19-3-13, which provides as follows:

> Any person, company or corporation that may appropriate and stock a range upon the public domain of the United States, or otherwise, with cattle shall be deemed to be in possession thereof: provided, that such person, company or corporation shall lawfully possess or occupy, or be the lawful owner or possessor of sufficient living, permanent water upon such range for the proper maintenance of such cattle.

The Walkers' argument can be summarized as follows: (1) to obtain and maintain a water right in New Mexico, a person must apply water to beneficial use, and the amount of the water right will be defined by the amount placed to beneficial use, *see* N.M. Const. art. XVI, § 3; (2) pursuant to Section 19-3-13, in order to stock a range a person must first show a valid water right in an amount sufficient to maintain the cattle; (3) in order to put that water to the beneficial use of stock watering, and thereby obtain and maintain a water right, the cattle must be allowed to graze on the surrounding range; and (4) necessarily, there is a link between a water right and use of the surrounding land for grazing which creates a right to forage.

{12} Focusing on this link between water and cattle, the Walkers argue that by rescinding their right to graze on the allotments, the Forest Service has deprived them of their right to make beneficial use of their water.[3] It is the purported right to graze (forage) of which the Walkers have allegedly been deprived and for which they seek compensation. After

---

[3]Stock watering is a beneficial use under New Mexico law. *McNew*, 33 N.M.at 429, 269 P. at 62. This Court has specifically held that grazing cattle is not a beneficial use. *State ex rel. Reynolds v. Miranda*, 83 N.M. 443, 445, 493 P.2d 409, 411 (1972) ("[I]t [cannot] be said that defendant's predecessors applied the waters to beneficial use by grazing cattle upon the grasses in the wash.").

drawing this connection between water and use of the surrounding land, the Walkers draw further support for their claim from certain phrases pulled from precedent of this Court and our Court of Appeals which will be discussed in detail further in this opinion.

{13} One court has framed the question as follows: "whether [the] alleged grazing interest is a stick in the bundle of rights," under state water law, that the Walkers have acquired with their water rights on the allotments. *Colvin Cattle Co., Inc. v. United States*, 468 F.3d 803, 806 (Fed. Cir. 2006) (*Colvin II*). Before turning to New Mexico law on this matter, we observe that certain federal courts have addressed this question generally, including one that has dealt specifically with New Mexico law. We begin with these federal cases to provide helpful context and background for our subsequent analysis of state law.

**A. Federal Case Law**

{14} We are not the first court to entertain a claim of a right of forage incident to an existing water right. Federal courts have rejected similar claims based on relevant federal law as well as claims arising from analogous state law. One federal case, *Diamond Bar Cattle Co. v. United States*, 168 F.3d 1209 (10th Cir. 1999), has even construed New Mexico state law on point in rejecting a claim very similar to that put forth by the Walkers.

{15} In *Diamond Bar*, the Tenth Circuit Court of Appeals examined whether New Mexico law bestows "a private property right to graze cattle on the public domain upon

all those with a valid water right." *Id.* at 1213. Similar to the case before us, *Diamond Bar* involved private ranchers grazing cattle on federal land pursuant to Forest Service permits. *Id.* at 1210. The ranchers and their predecessors had grazed cattle on that federal land for over one hundred years, before creation of the Forest Service. *Id.* When it was time to renew their permits, the ranchers refused to sign unless the Forest Service recognized their "valid existing rights" to the federal lands. *Id.* As owners of vested water rights under state law, the ranchers claimed they were also entitled to an "inseparable right to graze the lands that comprise their allotments." *Id.* Like the Walkers in this case, the ranchers in *Diamond Bar* did not claim a "title or other real property interest in the land itself," but rather "a private 'possessory' property right that entitle[d] them to use of the water and range for the purpose of raising livestock."[4] *Id.*

{16} Before applying New Mexico law, the Tenth Circuit addressed federal regulation of federal public lands. *Id.* at 1211-12. The court noted that "Congress' power under the Property Clause to regulate the public lands [i]s 'without limitations.'" *Id.* at 1211 (quoting *United States v. City & County of San Francisco*, 310 U.S. 16, 29 (1940)). The court then discussed the various statutes passed by Congress regulating grazing in national forests. *Id.* at 1212 (noting that grazing in national forests be conducted by permit and that

---

[4]Though the *Diamond Bar* plaintiffs sought a different remedy than the Walkers, namely continued possession of the range as opposed to compensation, the nature of the property interest at issue in both cases is the same. *See Colvin Cattle Co. v. United States*, 67 Fed. Cl. 568, 574 n.5 (2005) (*Colvin I*).

the "use of public lands for grazing is not a right but a privilege"). The *Diamond Bar* plaintiffs acknowledged federal law, but, similar to the Walkers, argued that it did not apply to rights that "were 'appropriated' pursuant to state law before the federal government removed the land at issue from the public domain." *Id.*

{17} To ascertain what rights, if any, were "appropriated" by state law during the time of the open range, the Tenth Circuit turned to New Mexico law. *Id.* at 1213-14. The court first looked at Section 19-3-13, the identical statute relied on by the Walkers herein, and the New Mexico cases addressing it which will be discussed more fully later in this opinion. *Id.* (citing *McNew*, 33 N.M. 414, 269 P. 56; *Yates v. White*, 30 N.M. 420, 235 P. 437 (1925); *Hill v. Winkler*, 21 N.M. 5, 151 P. 1014 (1915)). Section 19-3-13, it will be recalled, stipulates that any person who stocks a range upon the public domain with cattle "shall be deemed to be in possession thereof." Citing New Mexico case law, the court concluded that while Section 19-3-13 may "purport to grant 'possessory' interests in public domain lands that may be enforceable against non-federal claimants, no New Mexico statute grants (*nor could it grant*) a property interest in federal lands that may be enforced against the United States." *Id.* at 1214 (emphasis added). As we will see later in this opinion, the *Diamond Bar* court correctly construed the narrow reach of Section 19-3-13 and the cases interpreting it. Thus, the holding in *Diamond Bar* stands in direct opposition

to the Walkers' claim, both as a matter of state and federal law.[5]

{18} The Walkers, and the Certification Order from the Federal Court of Claims, also refer to another federal case, *Hage v. United States*, which the Walkers use to support their assertion that local law and custom define what is encompassed in the Walkers' water right. 42 Fed. Cl. 249 (1998) (*Hage I*), *rescinded in part by* 51 Fed. Cl. 570 (2002) (*Hage II*). In *Hage I*, the Court of Claims was asked to assess the property rights of certain ranchers to the surface estate of federal allotments based on their ownership of vested water rights under state law. *Id.* at 249; *see Hage II*, 51 Fed. Cl. at 573-74. Among the federal cases that have addressed similar issues, *Hage I* stands alone in its statement that "implicit in a vested water right based on putting water to beneficial use for livestock purposes was the appurtenant right for those livestock to graze alongside the water." 42 Fed. Cl. at 251; *see also Hage II*, 51 Fed. Cl. at 581 (noting that a forage right attaches to a ditch right-of-way under Nevada law). Understandably, the Walkers place great reliance on the federal court's opinion in *Hage I*.

---

[5]The Tenth Circuit also denied Diamond Bar's claim to an implied forage right under the federal Mining Act of 1866, similar to a claim made by the Walkers in federal court. *Diamond Bar Cattle Co.*, 168 F.3d at 1215. The Mining Act recognizes and protects those who have had rights to the use of water according to "local custom, law, and the decisions of [state] courts." *Id.* (quoting the Mining Act, 43 U.S.C. § 661 (2000)). Therefore, if ranchers can be said to have such an implied right to forage incident to an existing water right, then arguably it would fall within the protection of the federal Mining Act. The Tenth Circuit rejected such an argument in language that seemingly would apply to the Walkers herein: "The Act cannot fairly be read to recognize private property rights in federal lands, regardless of whether proffered as a distinct right or as an inseparable component of a water right." *Id.*; *accord Gardner v. Stager*, 892 F. Supp. 1301, 1302 (D. Nev. 1995), *aff'd* 103 F.3d 886 (9th Cir. 1996)); *Colvin II*, 468 F.3d at 807-08.

{19} For two reasons, *Hage I* does not support the Walkers' assertion that their New Mexico water right encompasses a right to forage. First, the holding in *Hage I* was dependent on Nevada law, not New Mexico law. *See Hage II*, 51 Fed. Cl. at 576-77. Our task is to determine whether *New Mexico law* supports the proposition that a water right includes the right to graze on public lands. Second, and more importantly, the continued validity of *Hage*'s holding has recently been called into serious question by *Colvin Cattle Co. v. United States*, 67 Fed. Cl. 568, 570 (2005) (*Colvin I*), *aff'd by Colvin II*, 468 F.3d 803. In that case, the Court of Claims held that a water right under Nevada law does *not* contain an appurtenant right to graze. *Colvin I*, 67 Fed. Cl. at 575. While not expressly overruling *Hage*, both *Colvin* opinions held that Nevada law does not support a claim identical to what the Walkers assert here and similar to what the ranchers said in *Hage*. *See id.*; *Colvin II*, 468 F.3d at 807. Thus, it appears that all federal authority on this matter is contrary to the position the Walkers now ask this Court to endorse. For these reasons, we expressly decline to follow the rationale put forth in the *Hage I* opinion. We now turn to our analysis of state law.

**B. New Mexico State Law**

{20} As previously noted, the Walkers' state law argument is premised on three overlapping legal areas: the beneficial use requirement, the language of Section 19-3-13 and its interplay with the beneficial use requirement, and certain language drawn from our

precedent. We begin with a brief discussion of New Mexico water law as it has developed over time.

**1. Foundational Principles and Historical Development of New Mexico Water Law**

{21} The prior appropriation doctrine governs water law in New Mexico. *See* N.M. Const. art. XVI, § 2 ("Priority of appropriation shall give the better right."); *Montgomery v. Lomos Altos, Inc.*, 2007-NMSC-002, ¶ 5 n.3, 141 N.M. 21, 150 P.3d 971 (citing NMSA 1978, § 72-1-2 (1907)). Under prior appropriation, "the right to use water is considered a property right which is separate and distinct from ownership of the land." *KRM, Inc. v. Caviness*, 1996-NMCA-103, ¶ 6, 122 N.M. 389, 925 P.2d 9); *see* Charles T. DuMars & A. Dan Tarlock, *Symposium Introduction: New Challenges to State Water Allocation Sovereignty*, 29 Nat. Resources J. 331, 332 (1989) (noting that under prior appropriation a "water right [is] a quasi-exclusive property right (*not tied to the locus of use*)" (emphasis added)). Thus, a water right is not an automatic stick in the bundle of rights a landowner receives upon purchasing even a fee interest in land.

{22} Under the doctrine of prior appropriation, water rights are both established and exercised by beneficial use, which forms "the basis, the measure and the limit of the right to use of the water." N.M. Const. art. XVI, § 3. A water right is separate and distinct from a right to adjacent land because it is derived not from the rights in the land, but "from appropriation for beneficial use." *Olson v. H & B Props., Inc.*, 118 N.M. 495, 498, 882

P.2d 536, 539 (1994). As a result of the separate and distinct nature of a water right, that right must be exercised or lost; one cannot sit on water rights to the exclusion of any other claimant without putting them to beneficial use. *See* Ira G. Clark, *Water in New Mexico: A History of Its Management and Use* 39 (1987) ("Since the criterion was application of water to beneficial use, this was not a property right which could be acquired in perpetuity; it had to be exercised to be kept alive.").

{23} The sole exception to the general rule that water rights are separate and distinct from the land is water used for irrigation. *See KRM*, 1996-NMCA-103, ¶ 8 (holding that Section 72-1-2 and NMSA 1978, § 72-5-22 (1953) "evince an intent to create a limited statutory exception to the general rule that water rights and land ownership are distinct property rights"). Irrigation water rights are appurtenant to the land, meaning that any conveyance of the land will carry the water right with it unless the water right is expressly reserved by the grantor. *See* NMSA 1978, § 72-1-2 (1953) (providing that "all waters appropriated for irrigation purposes . . . shall be appurtenant to specified lands owned by the person, firm or corporation having the right to use the water"); § 72-5-22 (providing that "the transfer of title of land in any manner whatsoever shall carry with it all rights to the use of water appurtenant thereto for *irrigation* purposes, unless previously alienated in the manner provided by law" (emphasis added)); *Turner v. Bassett*, 2005-NMSC-009, ¶ 10, 137 N.M. 381, 111 P.3d 701 (noting that under Sections 72-1-2 and 72-5-22, "water

that is applied to irrigation becomes appurtenant to the land on which it is used").

{24} The prior appropriation tradition, as it exists in New Mexico today, can be traced to the convergence of practices followed in northern Mexico prior to the cession in 1848 with practices developed in connection with Anglo western settlement. *See United States v. Rio Grande Dam & Irrigation Co.*, 9 N.M. 292, 306, 51 P. 674, 678 (1898) (stating that "[t]he law of prior appropriation existed under the Mexican republic at the time of the acquisition of New Mexico"), *rev'd on other grounds by* 174 U.S. 690 (1899); Clark, *supra*, at 41-42 (noting that the "water institutions of New Mexico represent a fusion" of early Spanish law and custom with "the pure form of the doctrine of prior appropriation [which] stems from the California gold rush"). The prior appropriation doctrine's independence of water from the land, and the requirement that a water right be exercised continuously, distinguish water rights under the prior appropriation doctrine from water rights under the riparian doctrine. *See* Clark, *supra*, at 39. The riparian doctrine governs water rights in most eastern states, and grants landowners the right to make reasonable use of water that flows through or otherwise abuts their land. Ownership of a water right under the riparian doctrine is in "no way affected by failure to exercise the right." *Id.* at 37.

{25} Early Western settlers, such as those in the gold mining camps of California and the early irrigation settlements in Colorado, found the riparian doctrine unworkable in the arid

West because they often had to divert water from its source in order to use it beneficially because the land associated with the use of the water did not itself contain a water source. *See* A. Dan Tarlock, *The Future of Prior Appropriation in the New West*, 41 Nat. Resources J. 769, 770 (2001); Clark, *supra*, at 37-40. Under the traditional riparian doctrine, the new Western settlers would have had to show that their reasonable use did not interfere with those downstream. *See* Clark, *supra*, at 37 ( noting that under the riparian doctrine, the reasonable use of a water right must not significantly interfere with downstream riparian appropriators). This riparian doctrine made sense in the eastern states where larger sources of water exist, and, therefore, not as many people had to tap into a single source resulting in less effect on downstream users. *See* Norman K. Johnson & Charles T. Dumars, *A Survey of the Evolution of Western Water Law in Response to Changing Economic and Public Interest Demands*, 29 Nat. Resources J. 347, 348-49 (1989). In the western states where populations were limited to fewer and smaller water sources, most uses somehow affected downstream users. *See id.*

{26} As indicated by its historical evolution in the West, a primary feature of the prior appropriation doctrine and its concomitant beneficial use requirement was the need for water to be mobile or divertible to other areas of use and not tied to the surrounding land. *See* 2 Joseph W. Dellapenna, Waters and Water Rights 11.02 (a), (d) (Robert E. Beck, ed., 1991 ed., 2001 Repl. Vol.) (noting the key attributes of prior appropriation address the

need in arid regions to divert and transport water in order to place it to beneficial use). Because water is a scarce commodity in the West, mobility and transferability are necessary to meet changing social goals. This often means moving water from one location to another and also from one use to another. *See Kaiser Steel Corp. v. W.S. Ranch Co.*, 81 N.M. 414, 419, 467 P.2d 986, 991 (1970) (discussing how even private parties may exercise powers of condemnation to construct facilities to transport water and put it to beneficial use such as mining); Clark, *supra*, at 39 (stating that prior appropriation "had released the arid western region from restricting its scant water resources to the limits of riparian lands, making possible the diversion of those waters to areas where they could be applied more effectively").

{27} Water rights are therefore not tied to a particular location or even a particular source. *See* NMSA 1978 § 72-5-23 (1985) (change of place of use); NMSA 1978 § 72-5-24 (1985) (change of purpose); NMSA 1978 § 72-12-7 (1985) (change of location of well for groundwater). As such, water rights are not considered ownership in any particular water source, but rather a right to use a certain amount of water to which one has a claim via beneficial use. *See* Joseph L. Sax, *Rights that "Inhere in the Title Itself": The Impact of the* Lucas *Case on Western Water Law*, 26 Loy. L.A. L. Rev. 943, 944 ("Water has been described as merely usufructuary; as belonging to the public; as subject to public servitudes; as incapable of full ownership; as subject to constraints that it be used

nonwastefully, reasonably, beneficially, etc." (citation omitted)). Thus, under prior appropriation, as a separate protected property right, a vested water right can be "sold, leased, or transferred." *KRM*, 1996-NMCA-103, ¶ 5.

{28} This mobility of water rights, generally not appurtenant to any specific land, informs our analysis of the Walkers' argument in this case. As we shall see, the Walkers would have this Court undermine years of established law by declaring such a link, or an appurtenance, between land and water in the non-irrigation context.

**2. Section 19-3-13 and Its Interplay with the Beneficial Use Requirement**

{29} The Walkers draw on New Mexico statutory law in support of their assertion that the law of New Mexico "tied the appropriation of water to the appropriation of range for the beneficial use of raising livestock and 'possession' of the range was directly tied to a vested water right." As noted previously, this argument is based on Section 19-3-13, which states:

> Any person, company or corporation that may appropriate and stock a range upon the public domain of the United States, or otherwise, with cattle shall be deemed to be *in possession thereof*: provided, that such person, company or corporation shall lawfully possess or occupy, or be the lawful owner or possessor of sufficient living, permanent water upon such range for the proper maintenance of such cattle.

(Emphasis added.) The Walkers further argue that Section 19-3-13 conferred a "possessory interest in an easement to stock the public range in conjunction with water

ownership." In other words, the statutory use of the word "possession" in connection with discussion of a valid water right to support cattle demonstrates a legislative intent to give those with a water right for stock watering on the public domain a possessory interest in that range attendant to the water right.

{30} As correctly observed by the Tenth Circuit in *Diamond Bar*, this Court has already confronted the nature of the possessory interest discussed in Section 19-3-13 and held that it is not as broad as the Walkers interpret it to be. As early as 1915, this Court stated that the precursor to Section 19-3-13 did not "grant any exclusive right in the use of the public domain." *Hill*, 21 N.M. at 11, 151 P. at 1015. *Hill* addressed whether the predecessor to Section 19-3-13 conflicted with federal laws specifying that public lands should be left open for all to enjoy. *Id.* at 10-12, 151 P. at 1015-16. In holding that Section 19-3-13's predecessor was a proper use of the police power, and not in conflict with federal law, this Court noted that granting any party an exclusive right to the public domain would violate federal law, "and must therefore be held invalid." *Id.* at 11, 151 P. at 1015. Construing the predecessor to Section 19-3-13 narrowly, this Court observed that the New Mexico statute simply required "that all those who seek to stock a range upon the public domain must, before doing so, lawfully possess, or be the lawful owner of, sufficient permanent water on such range for the proper maintenance of such cattle." *Id.* at 11, 151 P. at 1016. *Hill* thus states that to use the land of the public domain for stock watering, one must have

a water right to support those cattle. However, *Hill* never implies the converse: that a water right on the public domain used to water cattle creates a land right in that range.

{31} In *Yates*, this Court expanded on *Hill*, holding that under the predecessor to Section 19-3-13, when a person has obtained sufficient water on the public range to raise cattle, that person has the right to the exclusive enjoyment of that range, but only as "against others who did not develop other waters upon the same [lands]." *Yates*, 30 N.M. at 422, 235 P. at 437. While noting that the predecessor to Section 19-3-13 provides access to those with water rights, in *Yates* we emphasized that such access to the public domain is not a right but a privilege, governed by license from the federal government. 30 N.M. at 422, 235 P. at 437; *see also* William D. Rowley, *U.S. Forest Service Grazing and Rangelands: A History* 54 (1985) (noting that since the formation of the forest reserves, the use of terms such as "privilege" and "allotment" indicate "the government's contention that stockmen did not possess unlimited rights to graze on the reserves"). Accordingly, and contrary to the Walkers' assertion that they have a possessory interest to forage the public domain independent of their grazing permit, this Court has consistently held that Section 19-3-13 and its predecessor recognize merely a right in the use of the *license* to graze on public lands, allowing those with sufficient water rights to support cattle on such lands to exclude others without a water right. *Yates*, 30 N.M. at 422, 235 P. at 437; *Hill*, 21 N.M. at 11, 151 P. at 1015-16. This Court has never indicated that a person raising

cattle pursuant to a license has any separate interest in the public domain, aside from water rights protected by the Mining Act, that can be asserted against the United States government if that license is lost.

{32} In connection with Section 19-3-13, the Walkers also argue that the beneficial use requirement itself gives rise to a right to continue a particular beneficial use on the particular land upon which a water right is initially established. Thus, by limiting their ability to graze cattle on the allotment, the United States has put a barrier between the Walkers and their water right that will have the effect of terminating that right based on non-use. This argument is flawed for two reasons.

{33} First, the Walkers have not been forced into non-use, because as discussed previously, all water rights, even if appurtenant to a certain piece of land, can be severed from that land and applied to another use at a different location. *See* § 72-5-23 (laying out the process for changing place of use of an appurtenant water right); § 72-5-24 (laying out the process for changing the purpose of use and place of diversion for a vested water right); § 72-12-7 (laying out the process for changing well location and use); *see also* *Mathers v. Texaco, Inc.*, 77 N.M. 239, 248, 421 P.2d 771, 778 (1966) (noting that New Mexico statutes "expressly recognize that the right to use water upon certain lands may be severed from such lands and become appurtenant to other lands, or may be transferred for other purposes and other uses"); Tarlock, *supra*, at 777 ("Water rights, despite their

usufructuary character, have always been treated as transferable property rights."). Thus, the value of the Walkers' water right does not depend entirely on stock watering at the same location; the right can be severed from the allotments, moved to other lands, used for other purposes, or even sold. *See, e.g.*, *Colvin I*, 67 Fed. Cl. at 570 (noting that although a rancher was no longer permitted to graze cattle on certain Bureau of Land Management (BLM) lands, he continued to have a vested water right appurtenant to said lands, and thus the newly authorized rancher on the BLM lands had to haul in his own water).

{34} Second, the requirement that water must be put to beneficial use does not give rise to an interminable right to continue that same beneficial use. *See McNew*, 33 N.M. at 436, 269 P. at 65 ("It . . . does not follow that, because water has been appropriated for a particular use, it forever thereafter must be applied to that use." (quoted authority omitted)). For example, if one acquires a water right by beneficially using water in a milling operation, which operation is subsequently shut down due to environmental violations, the mill operator cannot claim a right to continue milling just to protect the water rights. In this case, the Walkers' ability to acquire and use their water right on the allotments was conditioned on the permission of the federal government to go on the land. The Walkers were thus responsible for maintaining their license to graze on the public land, and since they lost that license, they cannot now rely on a right to continue a particular beneficial use to maintain the water right that they were able to acquire by way

of government permission in the first place. Because the Walkers chose not to comply with the government's permitting process, they took the risk of either forfeiting their water right through non-use or being forced to transfer, lease, or sell that right.

**3. New Mexico Case Law-The *McNew* Case and Subsequent Developments**

{35} Along with Section 19-3-13, the Walkers rely on this Court's 1928 opinion in *First State Bank of Alamogordo v. McNew*, 33 N.M. 414, 269 P. 56 (1928), to support their argument that they have an implicit right to land incident to their water right. Quoting selectively from particular passages in *McNew*, the Walkers and their Amici assert that a possessory right to forage on public lands is implicit within a New Mexico water right. They accurately quote from *McNew* that, although the title to the public range rested with the United States, holder of the water right had "appropriated and stocked said range with cattle, and being the owner of permanent water for use upon said range for the maintenance of cattle thereon, had *possessory rights in said public lands*, which he could protect as against one forcibly entering thereon without right." 33 N.M. at 422, 269 P. at 59 (emphasis added). The Walkers argue that this language, which relies on the predecessor to Section 19-3-13 as well as on *Hill* and *Yates*, indicates that a vested water right based on grazing cattle necessarily includes a possessory interest in the very forage which is the object of that grazing.

{36} The Walkers also claim that *McNew* "analogizes a stockwater [sic] right to an

irrigation right," and thus supports a finding that an interest in land is incident to a water right. In other words, since irrigation water rights become appurtenant to the land on which they are used, stock watering rights, which are also tied to the land through grazing, imply a grazing right on the land surrounding the source of that water. The Walkers point to the following statement from *McNew*:

> Since water for stock-raising, as well as for irrigation, may become incident to the beneficial use of land, the cases cited are not distinguishable in that respect. The water right is considered incident or appurtenant to the land irrigated, because that is the use which it is applied and for which appropriated. For the same reason, it should be deemed incident to the land on which W.H. McNew's cattle grazed.

33 N.M. at 423, 269 P. at 60 (citation omitted). The Walkers assert that if stock watering rights can be incident to land, then conversely, a land right utilized to gain that water right, such as forage, can be incident to a water right.

{37} Upon careful analysis of the *McNew* opinion, we conclude that the Walkers have misread its holding as well as its place in New Mexico jurisprudence. *McNew* addressed whether a water right is appurtenant to a possessory interest in land. 33 N.M. at 4223, 269 P. at 59-60. Regardless of the holding of *McNew* on that issue, neither *McNew* nor any other New Mexico case supports the converse proposition: that a land interest is incident to a water right. In contrast to the facts of *McNew*, the Walkers do not seek to make a water right appurtenant to land; rather, they seek to make an *interest in land appurtenant*

*to a water right.* The *McNew* opinion never addressed such a claim. There is no support for applying *McNew* in this fashion. *See also Hunter v. United States*, 388 F.2d 148, 153-54 (9th Cir. 1986) (The argument that appurtenance runs both ways "claims too much. The appurtenance must be limited to that which is essential to the use of the right granted; it does not include the thing with which the right granted is used."); *Cleary v. Skiffich*, 65 P. 59, 63 (Colo. 1901) (holding that a water right does not include the right to use land on which to beneficially apply the water).

{38} While our discussion of *McNew* could end here, we think this distant opinion deserves further explanation, especially in light of the specific passages the Walkers selectively draw upon to support their argument. The facts of *McNew* provide important context and are historically interesting, being specific to the time of the "open range" when the public domain was utilized by settlers seeking to make a living in the arid conditions of the West. The McNews raised cattle on the public range, but held no title to the land. *McNew*, 33 N.M. at 422, 269 P. at 59. As part of their stock raising operation, the McNews purchased rights to a large amount of water and built the instrumentalities necessary to pipe that water to the range to water their cattle. *Id.* The McNews later orally conveyed their entire interest to their son, which conveyance was challenged by a creditor bank. *Id.* at 421, 269 P. at 59. The part of the opinion relevant to our discussion here involved whether those water rights could be conveyed orally, or whether a conveyance

of such rights would have to comply with the statute of frauds. *McNew*, 33 N.M. at 421-22, 269 P. at 59-60. Classifying the McNews' rights as possessory rights, which equity would protect against someone attempting to enter forcibly without better right, and the water rights as appurtenant or incident thereto, this Court agreed with the McNews that a written conveyance was not necessary. *Id.* at 423, 269 P. at 60 (relying on precedent from Oregon and Montana).

{39} Whatever the merits of an oral conveyance may have been in 1928, however, New Mexico water law has since evolved and made this inquiry moot. Since *McNew* was decided, our courts have recognized water rights as real property interests to which all the rules of real property apply, including the requirement of the statute of frauds that all such conveyances be in writing. *See Posey v. Dove*, 57 N.M. 200, 210, 257 P.2d 541, 547 (1953) ("It is generally conceded by all of the authorities that a water right, or an interest in water, is real property, and it is so treated under all the rules of law appertaining to such property." (quoted authority omitted)); *see also McNew*, 33 N.M. at 422, 269 P. at 59 (stating that the Court declined to confront the issue of whether water rights were real property). It is now clear under New Mexico law that a transfer of a water right must be in writing.

{40} Therefore, all of *McNew*'s language about water being "appurtenant" to possessory estates in land, utilized to avoid the statute of frauds, seems out of time, would not be

viewed the same today, and serves no continuing purpose for the law. As previously discussed, the law of New Mexico is clear that a water right is separate from any land right and not appurtenant, except in the irrigation context. To find any sort of interest in land, one must look to the land, not to a water right upon that land. To the extent *McNew* appears inconsistent with these principles, it has no contemporary legal effect and should no longer be cited for that purpose.

{41} Drawing on this same language from *McNew*, a later Court of Appeals opinion cited *McNew*, indicating in dicta that water used for certain domestic purposes, *"including watering livestock,"* can be incident to land "where the right to continue to use the water on the land is indispensable to the enjoyment of the land." *KRM*, 1996-NMCA-103, ¶ 7 (citing *McNew*, 33 N.M. at 430, 269 P. at 62-63) (emphasis added). The Walkers seize upon this language in *KRM* to support their argument that forage rights are implicit in a water right because without the right to forage their water right is valueless.

{42} To the extent that *KRM*, and specifically the final sentence in paragraph seven of that opinion, suggests that uses of water other than for irrigation purposes are appurtenant to land, we hereby correct that language. It relies on the very language in *McNew* that we have just held to be of no further legal effect. Though only dicta in *KRM*, that language is potentially confusing to the law; and therefore, in the interests of clarity, that discussion in paragraph seven should no longer be cited for the proposition that water can be incident

or appurtenant to land, except in the case of irrigation.

## C. Customary Practice

{43} Finally, the Walkers and Amici argue that New Mexico territorial customs and traditions expand a vested stock watering right to include a right to forage. Recounting historical practice, the Walkers observe that foraging by livestock has traditionally occurred adjacent to stock watering facilities. Due to the dry conditions present across much of New Mexico, access to water is essential to maintaining grazing livestock. As a result, even though rangeland historically was open to all who could utilize it, those with access to water made greatest use of the range because without water, livestock could not survive. The Walkers emphasize that "he who controlled the water controlled the range."

{44} While "control of the range" may have been the practical result of securing the resources necessary to maintain livestock over a particular area, that control does not lead to the conclusion that a stock watering right includes the right to other resources associated with stock watering. It is true that in order to be preserved by the Mining Act of 1866, an appurtenant forage right must have been identified and established by settlers. However, the United States correctly observes that none of the sources cited by the Walkers, including the law and customs of Spain, Mexico, and the New Mexico Territory as well as numerous historical accounts, maintain that a stock watering right includes an appurtenant grazing right. This "control of the range" was never a legally established

possessory interest in the range, particularly vis-à- vis the rights of the federal government. *See* Clark, *supra*, at 48 (noting that although ownership of water "frequently carried with it undisturbed use of . . . part of the public domain," such use was only the result of "judicious bending of the law coupled with a tolerant attitude on the part of the officials charged with its administration"); *Id.* at 37 (noting that early Western "[m]iners were simply squatters on the public domain, with no way of asserting legal ownership"); Maurice Frink, et al., *When Grass Was King: Contributions to the Western Range Cattle Industry Study* 384 (1956) (stating that ownership of water would give the owner "sufficient to control the backland, because the grass was useless without water," but that doing so was not done with the "formality of law" and could lead to charges). The self-evident fact that grazing will occur in areas adjacent to stock watering facilities does not translate into a legally enforceable right to graze by virtue of a stock watering right. That right to graze must come from an independent source of authority related to the land.

{45} The Walkers seek to establish a possessory interest that those utilizing the public domain for grazing have always sought—a surface interest in government land. *See* Debra L. Donahue, *Western Grazing: The Capture of Grass, Ground, and Government*, 35 Envtl. L. 721, 738 (2005) ("Before long, however, [grazing] operators sought land of their own and/or secure rights to government lands on which they could produce livestock"); *id.* at 740 (noting that all stock owners sought to "establish 'range rights' to lands they did not

own" (quoted authority omitted)). However, the law regarding the public domain has always been clear that while Western ranchers can lawfully gain access to and make use of public lands, such lands are not theirs for the taking. It was only through legislative action that, first, homesteaders using the land for irrigation, then ranchers under certain limited conditions, could legally take some of the public domain for private ownership. *See* Homestead Act of 1862, ch. 561, 26 Stat. 1097 (previously codified at 43 U.S.C. §§ 161-284 (1970) (repealed 1976)) (allowing a homesteader to purchase up to 160 acres of cultivated public lands for a minimal price); Kincaid Act, ch. 1801, 33 Stat. 547 (previously codified at 43 U.S.C. §§ 222-24 (1970) (repealed 1976)) (expanding the size of homesteads to 640 acres in Nebraska); Stockraising Homestead Act, ch. 9, 39 Stat. 862, 862-65 (1916) (previously codified at 43 U.S.C. §§ 291-98 (1970) (repealed 1976)) (limiting homesteads for ranching purposes to 640 acres, much less than often required for successful ranching). And, as noted above, the right to use the public domain for ranching has always been characterized as a license, not a real property interest, with regard to the interest of the federal government. *Buford v. Houtz*, 133 U.S. 320, 326 (1890). Thus, the Walkers seem to be attempting to wage a battle lost at the turn of the last century, even prior to the federal permit system which made it clear that the right was a license, not a real property interest.

{46} In addition to the fact that custom does not support the Walkers' claim, we recently

held that customary practice is irrelevant when inconsistent with New Mexico law. *See State ex rel. Martinez v. City of Las Vegas*, 2004-NMSC-009, ¶ 32, 135 N.M. 375, 89 P.3d 47 ("Regardless of whether the pueblo rights doctrine has a valid historical basis in the law of antecedent sovereigns, New Mexico water law . . . precludes its recognition."). Having already held that the Walkers' claim is not recognized under New Mexico law, we will not displace that holding based on custom purportedly derived from "antecedent sovereigns." *See id.*

{47} We, therefore, hold that neither the laws of New Mexico nor customary practice support the Walkers' claim to an implicit "possessory" right to graze on the public domain that attaches to their water right.

**II. Does the Law of the State of New Mexico Recognize a Limited Forage Right Implicit in a Right-Of-Way for the Maintenance and Enjoyment of a Vested Water Right?**

{48} Similar to the argument that a forage right is implicit in a water right under New Mexico law, the Walkers also assert that a forage right is implicit in a right-of-way developed for the enjoyment of that water right.[6] In other words, the Walkers claim that a right to forage is within the scope of a right-of-way consistent with the Mining Act and state law. The Mining Act recognizes a property right in public lands for "the right of way

[6]Again, the United States disputes whether the Walkers have actually established a valid right-of-way on the allotment. Because the Court of Claims made clear that both certified questions needed to be answered, we assume there is a valid right-of-way for our review.

for the construction of ditches and canals" to carry water. 43 U.S.C. § 661 (2000). We must determine if the scope of such a right-of-way includes a forage right under New Mexico law.

{49} In New Mexico, the scope of an easement, or right-of-way, is narrow and is measured by the "nature and purpose of the easement." *Olson v. H & B Props., Inc.*, 118 N.M. 495, 498, 882 P.2d 536, 539 (1994). The Walkers rely on Section 19-3-13 and New Mexico precedent to support their assertion that the scope of such a right-of-way includes the right to forage. As to Section 19-3-13, the Walkers claim that the requirement that stock owners have sufficient water "for the proper maintenance of such cattle"includes bringing the cattle to the water source to "maintain" them. Thus, the Walkers argue that Section 19-3-13 includes a provision for easements over federal land as part of the maintenance provision. The Walkers then take this argument one step further and, similar to the above argument, assert that Section 19-3-13 gives the possessory interest in the right to forage on the land surrounding the easement because it is impossible to keep a cow from eating while being herded to the water source.

{50} The language in Section 19-3-13 the Walkers rely on is vague and does not directly implicate any form of right-of-way or easement. The text of the statute does not use either of these terms. Moreover, as discussed in depth in our answer to the first certified question, Section 19-3-13 deals solely with priority of possession among users of the

range, and does not convey any possessory rights or surface rights of any kind in federal lands. And certainly no such rights are statutorily implied from one's status as a holder of water rights.

{51} There are, however, two statutes in New Mexico that do address similar types of rights-of-way. The first, NMSA 1978, § 72-1-5 (1981), states in pertinent part: "The United States, the state or any person, firm, association or corporation may exercise the right of eminent domain, to take and acquire property [and] right-of-way [rights-of-way] for . . . the storage or conveyance of water for beneficial uses." Accordingly, a right-of-way over private property for the use of a water right is limited to "storage or conveyance" of the water. If an easement over private land is so limited under New Mexico law, an easement over public lands should not be interpreted more broadly. Thus, while the Walkers might, at least in theory, have the right to move their water to their cattle, it is outside the scope of any statutory right-of-way to move cattle to the water, and incidentally have them graze along the way.

{52} NMSA 1978, § 73-2-10 (1953) is also directly contrary to the Walkers' claim. Section 73-2-10 states that "[a]ll plants of any description growing on the banks of [public] ditches, or acequias, shall belong to the owners of the land through which said ditches or acequias run." Thus, the grass growing on ditch banks is subject to grazing by the landowner, not the holders of any destination water rights. This statutory provision has

historical roots. *See* Clark, *supra*, at 26 (discussing the roots of this provision in traditional acequia law). Again, if a right-of-way for enjoyment of a water right through private lands, such as an acequia system, is so limited, there is no reason why a right-of-way through public land would be any broader.[7]

{53} We, therefore, hold that the laws of New Mexico do not support the Walkers' claim to a forage right on federal lands implicit in their right-of-way for the maintenance and enjoyment of a vested water right.

**CONCLUSION**

{54} Having determined that the case law and statutes of this State, as well as customary practice, do not support holding that a right to forage is within the scope of a water right or right-of-way for enjoyment of a water right, we answer both questions certified to us in the negative.

---

[7]Moreover, the cases cited by the Walkers and their Amici do not lend support to their argument. In *Jastro v. Francis*, this Court held that a private landowner could not keep another from driving his stock across the privately held land to public domain through use of a right-of-way, and that along the way the stock would necessarily pass over and consume "grass from some of the land of the private owner." 24 N.M. 127, 136, 172 P. 1139, 1142 (1918). The right-of-way in *Jastro* was specifically for the purpose of driving stock to the public range over private land, implicit in which is a right to forage. *Jastro* did not address any interruption to a vested water right. In the instant case, we are asked to determine what is implicit in a right-of-way for enjoyment of a water right. Thus, *Jastro* is not applicable.

{55} **IT IS SO ORDERED.**

**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

**EDWARD L. CHAVEZ, Chief Justice**

**PAMELA B. MINZNER, Justice**

**PATRICIO M. SERNA, Justice**

**PETRA JIMENEZ MAES, Justice**