# In the United States Court of Federal Claims

Case No. 91-1470L
Filed: June 6, 2008
FOR PUBLICATION

* * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| **THE ESTATE OF E. WAYNE HAGE AND THE ESTATE OF JEAN N. HAGE,** | * | 43 U.S.C. § 1752(g); takings; Fifth Amendment; just compensation cattle; vested water rights; 1866 Act Ditches; damages; grazing permit; Beneficial use; Federal Land Policy Management Act. |
| *Plaintiffs,* | * | |
| v. | * | |
| **THE UNITED STATES**, | * | |
| *Defendant.* | * | |

* * * * * * * * * * * * * * * * * * * * * * *

*Lyman Bedford*, McQuaid, Bedford & Van Zandt, LLP, San Francisco, CA, for Plaintiffs. *Michael Van Zandt*, of Counsel.

*Kathleen Lennon Doster*, Department of Justice, Environmental and Natural Resources Division, Washington, D.C., with whom was *Tim Racicot*, Special Assistant to the Assistant Attorney General, Department of Justice, Seattle, WA, for Defendant.

*Johanna Wald* and *Thomas Lustig*, National Resources Defense Council, San Francisco, for *amici curiae*, National Wildlife Federation, Sierra Club, National Resources Defense Council, Nevada Wildlife Federation, and Nevada Department of Wildlife. *Michael Wolz*, Deputy Attorney General, for *amici curiae*, State of Nevada and the State Engineer of Nevada. *Robin Rivett*, Pacific Legal Foundation, for *amicus curiae*, Pacific Legal Foundation. *John Echeverria*, Washington D.C. and *Joseph Feller*, Tempe, AZ, of Counsel.

## OPINION

SMITH, Senior Judge:

## I. Introduction

This case involves the conflict of two legitimate claims on the public lands. Both claims can be found in the Nation's earliest history. On the one hand there is the Nation's interest in preserving

the quality of its lands and exercising its ownership rights as well as getting adequate value for the public from those lands. Early on there was the competing interest of eager citizens and new immigrants in acquiring land to possess, to develop, and to settle in order to feed their families and live in freedom and independence from the feudal overlords who had owned the land they farmed in Europe. This desire for the seemingly limitless land west of the Atlantic coast, captivated virtually everyone, from George Washington to the humblest east coast farmer or landless town dweller.

As the country spread westward toward destiny the course of advancing population, with its farms and ranches, made the land vastly more valuable to the public. At this time the two contending interests were united by a common value, settling and exploiting this bounteous land for human development. In the West this beneficial harmony faced a harsh natural fact: lack of water. Land without water, assuming no useful minerals, was useless and hence worthless. But with the application of human effort and capital water could be made to flow to some of this land. Both the public and the would-be landowner again had a common interest in this goal. Since government could not invest the capital needed private individuals were the only source of the capital that could benefit both the public and the landowner. Central to this era was the legal doctrine, still recognized in much of the West, that vested property rights could be obtained in water by using that water and by diverting it from its natural channels to serve beneficial activities like agriculture and ranching, and in some cases mining and municipal uses.

This case deals with a time of divergence between the interests of the public and those of the landowners. The common interest in development by both no longer is universally the case. As government seeks to change its policies concerning the purpose and use of public lands, private landowners have a valid claim to preserve their vested rights. Because of historic water law many of those vested rights affect and are affected by government policies. This produces a sometimes emotional conflict between deeply held and cherished values of those who have farmed and ranched for generations and those who wish to change the direction of public policy. This conflict is a drama worthy of a tragic opera with heroic characters; however, this is a court of law. Its duty is to decide cases in accordance with the law as that law is received from the cases which bind us, and the statutes, and the Constitution which the Court is bound by its oath to follow.

Plaintiffs, the estate of E. Wayne Hage and the estate of Jean N. Hage, have been the owners of the Pine Creek Ranch ("Ranch") in Nye County, Nevada since 1978. The Pine Creek Ranch is located in central Nevada and consists of approximately 7,000 acres of patented land used primarily for grazing cattle. In 1991, Plaintiffs filed a claim against the United States alleging Constitutional, contractual, and statutory causes of action arising from an alleged suspension and cancellation of permits to graze livestock on federal land. Plaintiffs allege that policies promoted by the Forest Service, combined with the Forest Service actively preventing Plaintiffs from accessing and maintaining their water rights, amounted to a taking of their property as requiring just compensation under the Fifth Amendment.

The Court has published four opinions in this case.[1] In this current and final stage of the litigation, the Court must determine whether the Government's actions amounted to a taking as defined by the Fifth Amendment and, if so, what is the amount of just compensation due to Plaintiffs. In addition, the Court must determine whether Plaintiffs are entitled to recover compensation under the Federal Land Policy and Management Act. 43 U.S.C. § 1752(g).

## II. Facts

The facts of this case are well-described in the Court's previous four opinions. *See supra* note 1. Briefly, the Pine Creek Ranch, which Plaintiffs purchased in 1978, was established in 1865. To raise cattle economically in such an arid region, Plaintiffs depend upon access to large quantities of land, including federal land, and to the limited water supply in the Toiyabe National Forest. Plaintiffs use ditch rights-of-way, which are easements on federal land, to transport water for irrigation, stock watering and domestic purposes.

After purchasing Pine Creek Ranch, Plaintiffs constructed range improvements, both on the patented lands (the land Plaintiffs own) and on the allotments appurtenant to the Ranch. These improvements included corral and water facilities at the Pine Creek well, drift fences in the Monitor Valley, and a cattle guard in the Mosquito Creek area. Further range improvements included new spring boxes at Ice House Spring and at Frazier Spring. At Steward Spring, Plaintiffs installed a new spring box and three miles of pipeline to a holding tank and trough.

In 1979, after receiving permission from the Forest Service, the Nevada Department of Wildlife released elk into the Table Mountain allotment area of the Toiyabe National Forest. The Forest Service approved the release after conducting two studies to determine the suitability of introducing elk into the area. Plaintiffs objected to the Forest Service's action arguing that the elk drank water and ate forage which belonged to Plaintiffs and were needed for their cattle. Plaintiffs also informed the State of Nevada that the hunting season for elk overlapped with the cattle grazing period and that the presence of elk impeded the grazing and movement of their livestock. The State of Nevada responded that cattle grazing and hunting on public land "appeared to be reasonably compatible." *Hage II*, 35 Fed. Cl. at 154.

With the introduction of elk on Table Mountain came numerous problems, including elk hunters tearing down fences and scattering cattle. In addition, the overlap between grazing season and elk hunting season interfered with the Hages' ability to get the cattle off Table Mountain at the end of grazing season. Following the introduction of elk, the Forest Service fenced off certain meadows and spring sources on the Table Mountain allotment and erected electric fences which excluded Plaintiffs' cattle from waters owned by Plaintiffs, as well as from the adjacent forage. The

---

[1] *Hage v. United States*, 35 Fed. Cl. 147 (1996) (*Hage I*); *Hage v. United States*, 35 Fed. Cl. 737 (1996) (*Hage II*); *Hage v. United States*, 42 Fed. Cl. 249 (1998) (*Hage III*); *Hage v. United States*, 51 Fed. Cl. 570, 572 (2002) (*Hage IV*).

fences excluded cattle but allowed elk, who could jump the fences, to access the water.

Relations between the Forest Service and Plaintiffs deteriorated. In 1983, Plaintiffs received 40 letters from the Forest Service charging them with various violations. In the same year, the Forest Service paid 70 visits to Plaintiffs. Following the 40 letters and 70 visits, the Forest Service filed 22 charges against Plaintiffs. Many of these complaints cited issues of fence maintenance, some of them extremely minor infractions. In addition, the Forest Service insisted that Plaintiffs maintain their 1866 Act ditches with nothing other than hand tools.

Willows, other riparian growth, and upland vegetation proliferated upstream from Plaintiffs' lands. As a result of the pinion, juniper, and willows clogging the canyon, Plaintiffs saw a significant reduction in the water flow to their irrigated pastures. From water in the Corcoran Creek, for example, Plaintiffs could irrigate 20 acres, contrasted with 80 acres in the mid-1990s. A proliferation of vegetation and the existence of dozens of beaver dams on Barley Creek has effectively stopped the flow of water to Plaintiffs' Haystack fields. When Plaintiffs purchased the Ranch, Barley Creek ditch irrigated approximately 1,000 acres of the Haystack fields. The waters in Mosquito Creek, Pine Creek Ditch, and other creeks in which Plaintiffs have a vested water right showed a sharp decrease in water flow. The Government threatened to prosecute Plaintiffs for trespassing if they entered federal lands to maintain their ditches. As the Court stated in *Hage IV*, this was clearly no idle threat, as the Government unsuccessfully prosecuted Mr. Hage for clearing trees around the White Sage Ditch. 51 Fed. Cl. at n. 13. The Government stated that Plaintiffs should have applied for a special use permit for permission to cut the trees surrounding their vested water rights.

In 1990, the Forest Service determined that Meadow Canyon Allotment had been "overgrazed" and ordered Plaintiffs to keep off that area. Meadow Canyon had 25 miles of unfenced boundary with Monitor Valley, and cattle often drifted between the two allotments. With such a large unfenced boundary, it was nearly impossible to keep cattle from wandering onto Meadow Canyon. In July 1990, the Forest Service ordered Plaintiffs to remove all cattle from Meadow Canyon by August 10, 1990. In August of that year, the Forest Service sent Plaintiffs a letter asking them to show cause why 100% of their cattle numbers on the Meadow Canyon Allotment should not be cancelled. Mr. Grider, the district ranger during the time in question, admitted that the Hages did not receive his show cause letter until August 20, 1990, even though the letter gave the Hages six days from August 17, 1990 to comply. The district ranger issued a notice to Plaintiffs in the Fall of 1990 that any cattle found on Meadow Canyon were subject to impoundment. Mr. Hage responded with several letters detailing the problems inherent in keeping cattle off Meadow Canyon and detailing his attempts to prevent cattle from entering.

In 1991, the Forest Service twice impounded Plaintiffs' cattle, and when Plaintiffs were unable to redeem the cattle by paying the costs of impoundment, the cattle were sold by the Forest Service at auction for a total of $39,150.00. The Forest Service kept the proceeds of the sale.

## III. Procedural History

Plaintiffs filed a claim in this Court alleging: 1) the Government took compensable property interests in their grazing permit, water rights, ditch rights-of way, rangeland forage, cattle, and ranch; 2) the grazing permit was a contract, which Defendant breached, entitling them to damages; and 3) they are entitled to compensation for improvements they made on public rangeland. *See Hage I*, 35 Fed. Cl. at 150.

In *Hage I*, the Court granted-in-part and denied-in-part the Government's Motion for Summary Judgment. *Id.* The Court held that Plaintiffs' grazing permit was a license, not a contract or a property interest, and hence no damages could be awarded for its revocation. *Id.* at 165 ("It is settled law that grazing permits, though they are of much value to ranchers in the operation of an integrated ranching unit, nevertheless do not constitute property for purposes of the just compensation clause."). However, the Court denied the Government's Motion for Summary Judgment with regard to: 1) whether Plaintiffs had a property interest in foraging rights, water rights, and ditch right-of-ways in the Toiyabe National Forest, *id*. at 171; 2) whether the cancellation of Plaintiffs' permit to graze cattle on Federal lands was done, at least in part, to devote the rangeland to another public purpose, in which case Plaintiffs were entitled to compensation for the improvements they made on the land, *id.* at 178; and 3) whether the Forest Service's impoundment of the Hages' cattle constituted a compensable taking, *id.* at 176.

In *Hage II*, the Court denied the motion of various state and private groups to intervene in the case, but granted them *amici curiae* status so that they could participate in the adjudication process. 35 Fed. Cl. at 739. The State of Nevada, the State Engineer of Nevada, National Wildlife Federation, National Resources Defense Council, Nevada Wildlife Federation, Sierra Club, Nevada Department of Wildlife, and Pacific Legal Foundation were granted status as *amici curiae*. *Id.*

After a two-week trial on the property phase, the Court issued a preliminary opinion that served to "streamline and expedite post-trial briefing." *Hage III*, 42 Fed. Cl. 249. The Court later rescinded its decision in *Hage III* with a final opinion on four issues regarding Plaintiffs' property rights. *Hage IV*, 51 Fed. Cl. at 570. First, the Court again held that Plaintiffs did not have a property interest in grazing permits that could give rise to a taking claim, as a grazing permit is a license, not a irrevocable right. *Id.* at 586-588 ("[Plaintiffs'] fee lands and water rights must be valued independently of any value added by any appurtenant grazing permits or grazing preferences."). Second, the Court denied Plaintiffs' claim to a 752,000 acre surface estate for grazing, relying on numerous western land statutes going back to the 18th century. *Id.* at 588-592. Third, the Court determined under Nevada law that Plaintiffs had appropriated and maintained vested water rights

in various 1866 Act ditches[2], wells, creeks, and pipelines, as well as waters in the Monitor Valley[3], Ralston[4], and McKinney allotments[5]. *Id*. at 576-580. These water rights fell into three major categories: 1) 1866 Act ditches[6]; 2) stockwaters; and 3) waters flowing from federal lands to Plaintiffs' patented land. Finally, the Court held that Plaintiffs were entitled to ditch rights-of-way on each side of the 1866 Act Ditches. *Id.* at 581-584.

In 2004, the Court held a two-week trial in Reno, Nevada to determine whether the Government's actions constituted a taking, and if so, what just compensation was due to Plaintiffs. Following the filing of post-trial briefs by Plaintiffs, Defendant, and *amici curiae*, the Court heard oral argument. In this fifth and final opinion, the Court will first turn its attention to the taking issue, addressing each category of property identified in *Hage IV*. Then the Court will address Plaintiffs' claim for compensation under 42 U.S.C. § 1752(g).

## IV. Taking

### A. Legal Standard

The notion of private property is fundamental to the existence of our Nation. It is a fundamental duty of a government to protect, rather than to destroy, personal property. JOHN LOCKE, TWO TREATISES ON GOVERNMENT §§ 124, 201, 222 ("[w]henever the *legislators endeavor to take away, and destroy the Property of the People* . . . they put themselves into a state of War with the People, who are there upon absolved from any further obedience.") (emphasis in original). The Founders of our Nation envisioned personal property as a fundamental right. It is part of the trinity of values underlying in our reverence for "life, liberty, and property." These three ideas are all

---

[2] Andrew's Creek Ditch, Barley Creek Ditch, Borrego Ditches, Combination Pipeline, Corcoran Pipeline, Corcoran Ditch, Meadow Creek Ditch, Pasco or Tucker Ditch, Pine Creek Irrigating Ditch, Spanish Spring Pipeline, White Sage Irrigation Ditch. *Hage IV*, 51 Fed. Cl. at 583.

[3] Andrews Creek, Barley Creek, Combination Springs, Meadow Canyon Creek, Mosquito Creek, Pasco Creek, Pine Creek, Smith Creek, White Sage Ditch. *Hage IV*, 51 Fed. Cl. at 579.

[4] AEC Well, Airport Well, Baxter Spring, Black Rock Well, Cornell Well, Frazier Spring, Henry's Well, Humphrey Spring, Pine Creek Well, Ray's Well, Rye Patch Channel, Saulsbury Well, Silver Creek Well, Snow Bird Spring, Spanish Spring, Stewart Spring, Well No. 2, Well No. 3. *Hage IV*, 51 Fed. Cl. at 579.

[5] Caine Springs, Cedar Corral Springs, Mud Springs, Perotte Springs. *Hage IV*, 51 Fed. Cl. at 580.

[6] Ditches as defined by the 1866 Ditch Rights-of-Way Act ("1866 Act"), 43 U.S.C. § 661.

aspects of the fundamental integrity of each person. As the Supreme Court has stated, "[p]roperty does not have rights. People have rights. The right to enjoy property without unlawful deprivation, no less than the right to speak or the right to travel, is in truth, a 'personal' right." *Lynch v. Household Finance Corp.*, 405 U.S. 538, 552 (1972).

The Fifth Amendment protects citizens by providing that if private property is taken for public use, those citizens should be justly compensated. U.S. Const. Ament. V. The classic example of a taking requiring just compensation is when "the government's action amounts to a physical occupation or invasion of the property, including the functional equivalent of a 'practical ouster of [the owner's] possession.'" *Transp. Co. v. Chicago*, 99 U.S. 635, 642 (1878), *see United States v. General Motors Corp.*, 323 U.S. 373 (1945) (holding the Government's occupation of a private warehouse was a taking). A permanent physical occupation constitutes a *per se* taking, "without regard to whether the action achieves an important public benefit or has only a minimal economic impact." *Loretto v. Teleprompter Manhattan CATV Corp.*, 468 U.S. 419 (1982).

This Court already held in *Hage IV* that the Government's actions which physically prevented Plaintiffs from accessing their 1866 Act ditches amounted to a physical taking. 51 Fed. Cl. at n. 13. However, there is no bright line between physical and regulatory takings. Several of Plaintiffs' other claims not previously addressed fall into the category of regulatory taking, such as the requirement of a special use permit for clearing brush and the regulations that led to willow proliferation. Therefore, the Court turns its attention to the legal standard for a regulatory taking.

The Supreme Court has declined to establish any "set formula" for determining when Government regulation is a taking. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992). Instead, the Court has focused on "essentially ad hoc, factual inquiries." *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978). *Penn Central* provides a multi-factor balancing test for determining when compensation is required for a regulatory taking: 1) the extent to which the regulation has interfered with distinct investment-backed expectations; 2) the character of the governmental action; and 3) the economic impact of the regulation on the claimant. *Id.* at 122. In addition, there are two categories of *per se* taking in which a balancing is not necessary. "The first encompasses regulations that compel the property owner to suffer a physical invasion of his property." *Lucas*, 505 U.S. at 1015. When an owner has suffered a destruction of his property through a regulation, "no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation." *Id.*, *see also Loretto*, 468 U.S. 419, 435-440 (1982). The second situation is when the regulation "denies all economically beneficial or productive use of the land." *Id.*

**B. The Impoundment of Plaintiffs' Cattle was not a Taking**

Plaintiffs seek compensation for the value of their impounded cattle. In July and September of 1991, the Forest Service impounded a total of 105 head, found in trespass on Meadow Canyon. These cattle were in trespass because the Forest Service had decided not to allow grazing on Meadow Canyon and had ordered Plaintiffs to remove all cattle from that allotment by August 10,

1990. Plaintiff had nearly a year in which to remove the cattle from that area. While the presence of elk hunters may have impeded access of the cattle for a portion of the year, the elk hunting season was confined to a few months and should not have prevented Plaintiffs from removing the cattle within a year. Again, the fact that the cattle were in trespass relates to the Forest Service's decision to not allow grazing on Meadow Canyon, which has no relevance to a Fifth Amendment claim, since the claimed property interest was, in fact, a revocable license and not a property right recognized by case law. As the Forest Service had the authority to determine whether Plaintiffs' cattle were allowed on Meadow Canyon and gave Plaintiffs nearly a year to comply with the decision before impounding the cattle, the impounding of Plaintiffs' cattle was not unlawful. After Plaintiffs were unable to redeem the cattle due to financial difficulties, Defendant sold the cattle at auction for $39,150.00. The Forest Service kept this amount, to cover the costs of impoundment.[7]

Therefore, the Court must **DENY** Plaintiffs' claim for compensation of the value of cattle impounded by the Forest Service.

### C. Plaintiffs are not Entitled to Compensation for the "Entire Ranch"

Plaintiffs argue that the Government's actions constituted a taking of the "entire ranch," focusing on the BLM's decision to cancel Plaintiffs' grazing permits and to suspend grazing on certain allotments. P. Post Tr. Brief at 21. This argument must fail in light of the Federal Circuit's decision in *Colvin Cattle Co. v. United States*, 468 F.3d 803, 808 (2006). As stated previously by this Court, Plaintiffs have no right to compensation based on the loss of their grazing permit. Further, the Federal Circuit has held, "[t]hat the ranch may have lost value by virtue of losing the grazing lease is of no moment because such loss in value has not occurred by virtue of governmental restrictions on a constitutionally cognizable property interest." *Id.*; *see also United States v. Fuller*, 409 U.S. 488 (1973).

Therefore, the Court **DENIES** Plaintiffs' claim for compensation for the "entire ranch."[8]

### D. Surface Waters Flowing from Federal Land to Patented Lands were Taken

---

[7] Plaintiffs admitted that "it was established that the sale proceeds of the Hages' impounded cattle were substantially less than the costs of impoundment." P. Post Tr. Brief at 10.

[8] Plaintiffs also allege that the Government's cancellation of their grazing permits resulted in a taking of their stockwaters, in which they have established a property right. These stockwaters originate and terminate on federal lands, and are used for cattle watering purposes when the cattle graze on the appurtenant meadows. However, the Federal Circuit has rejected this argument in *Colvin Cattle*. 468 F.3d at 807. There is no taking of the right to water livestock when a grazing permit is cancelled. Therefore, the Court must **DENY** Plaintiffs' claim for compensation for their stockwaters.

The surface waters which flow from federal land to Plaintiffs' patented lands are a vested water right which the Court recognized in *Hage IV*. *See supra* at 4. Plaintiffs argue that because of the policies and procedures employed by the Government, a portion of the surface waters that should flow to Plaintiffs' patented pastures no longer reach there. P. Post Tr. Reply at 11. According to Plaintiffs, the proliferation of riparian vegetation, the presence of beaver dams, and the denial of Plaintiffs' access to stream channels for clearing and maintenance purposes led to the reduced water flow. Therefore, Plaintiffs assert a taking and demand just compensation. The Court uses a two-part inquiry to assess the claims. First, Plaintiffs must show that they could have put the water to beneficial use. Second, Plaintiffs must show that the Government's actions rose to the level of a taking. Extensive evidence has convinced the Court that but for Government actions Plaintiffs would have had the water in which they had a vested right.

**1. Beneficial Use**

Plaintiffs, under Nevada law, do not own title to the water. Rather, they own the right to use the water, so long as that water is put to a "beneficial use." *See Desert Irrigation, Ltd. v. State*, 113 Nev. 1049, 1059 (Nev. 1997). The Nevada state legislature declared at the beginning of the twentieth century, "[b]eneficial use shall be the basis, the measure and the limit of the right to the use of water." NEV. REV. STAT. § 533.035. Plaintiffs must therefore establish that they could have put the water to beneficial use, for the right to use water cannot be unreasonable or include waste. *See United States v. Alpine Land & Reservoir Co.*, 697 F.2d 851, 854 (9th Cir. 1983). In addition, the right to use water can be lost by voluntarily abandoning it. *See In re Manse Spring*, 60 Nev. 250 (Nev. 1940).

Plaintiffs offered evidence at trial that the Pine Creek Ranch water rights could have been put to quasi-municipal use. Due to the growing demand for water in the Las Vegas area, Plaintiffs argue that the water could have been sold to the Southern Nevada Water Authority (SNWA) to sustain the growth in that area. However, Defendant countered with evidence that the SNWA did not consider Ranch waters a viable water resource option because of the significant distance and relatively small quantity of waters available. Plaintiffs also offered evidence that if it were not sold for quasi-municipal use, the water could have been sold for agricultural use for the irrigation of crops or for stockwatering.

As it appears to the Court that the sale for quasi-municipal use is unlikely, the probable and likely use for the surface waters would be for irrigation and other agricultural purposes. The Court finds that Plaintiffs would have put the waters to beneficial use to irrigate their own agricultural pastures, or could have sold the water to others to use for the same purpose, particularly considering the years in question had limited rainfall.

**2. Taking of the Ditches**

The next step of the analysis is whether the Government's actions rose to the level of a taking, requiring just compensation. Once again this Court turns its attention to the Federal Circuit's holding in *Colvin Cattle*. In order for Plaintiffs' claim to succeed, they must establish a taking of their property that is not related to the cancellation of grazing permits. In that case, the Circuit court held that the BLM's cancellation of a Nevada cattle company's grazing permit on federal land did not constitute a taking of the company's water rights, as the grazing permit was a privilege and not a right. *Colvin Cattle*, 468 F.3d at 807 ("Because Colvin's water rights do not have an attendant right to graze, no governmental action restricting Colvin's ability to graze on federal land can affect its water right in a manner cognizable under the Fifth Amendment."). In *Colvin*, the government denied access to the allotment for grazing purposes but did not impede access to the water. *Id.* at 806. Plaintiffs must, therefore, show that the Forest Service took actions or established policies, distinct from the decision to cancel Plaintiffs' grazing permit, that constituted a taking under the Fifth Amendment.

It is important to again note the difference between water ownership and real property ownership; water is a usufructuary as opposed to a possessory right. Whereas real property ownership is defined by a right to exclude others from that property, water ownership is defined by the right to access and use that water. Plaintiffs argue that the Government took several actions that precluded their right to access and use their water.

**a. Constructing Fences Amounted to a Physical Taking**

First, Plaintiffs argue that the Government constructed fences around streams in which Plaintiffs have established a vested water right. These fences prevented Plaintiffs' cattle from accessing water during the time in which cattle were still permitted to graze on the allotments. In *Colvin Cattle Co.*, as previously described, the Federal Circuit held that the cancellation of a grazing permit did not constitute a taking of the plaintiff's water rights. 468 F.3d at 807. However, unlike this case, in *Colvin Cattle* the Government did not prevent the Plaintiff from accessing their water. *Id.* Here, the Government did not only cancel Plaintiffs' grazing permit; it actively prevented them from accessing the water through threat of prosecution for trespassing and through the construction of the fences. Clearly, these actions prevented Plaintiffs' access to the water and there was plainly a "physical ouster" which deprived Plaintiffs of the use of their property.

Therefore, the Court finds that the Government's construction of fences around the water and streams amounts to a physical taking during the time period in which Plaintiffs' still had a grazing permit and their cattle had the right to water at these streams. Since this pertains only to a limited time period, the Fifth Amendment inquiry does not end here.

**b. The Government's Actions Amounted to a Regulatory Taking**

Second, Plaintiffs argue that policies promoted by the Forest Service, including permitting brush to overgrow the stream beds and allowing beavers to establish dams in the upper reaches of streams, prevented Plaintiffs from accessing and using the water in the "upper reaches of the Hages' grazing lands." P. Post Tr. Reply at 14. Mr. Hage testified at trial that after 1990, he was only able to irrigate 25% of his land due to reduced waters in Mosquito Creek, Barley creek, and Pine Creek. Tr. 128:21. Spreading and evopotranspiration were also issues. Evapotranspiration represents the water used by plants, and can represent a significant loss of water when plants develop root structure into existing shallow aquifers or groundwater. Plaintiffs offered evidence at trial that the willow growth in the creeks had gotten so thick that it was difficult to walk across, or even to see in some places, the stream bed. Tr. 917:16. Plaintiffs' expert witness estimated the average historical flow in the seven creeks reaching the Ranch to be 13,000 acre feet. The actual flow at the time of trial was close to 5,000 acre feet, reflecting an 8,000 acre feet diminishment.

In *Ennor v. Raine*, the Supreme Court of Nevada recognized the right of a prior appropriator of water to go onto land upstream belonging to another to clear obstructions in the natural channel that interfere with the flow of water to his point of diversion. 27 Nev. 178 (1903) ("[Plaintiff] was as much entitled to have it flow through the Ennor ranch in the natural channel, and in the ditches used by him or his grantors prior to the location of that place, as through his own lands, and had as much right to remove dams and obstructions on the Ennor ranch to the extent necessary to allow his water to flow for the proper irrigation of his crops as he had to remove dams on his own ranch of obstructions in his own lane or doorway, provided he did so peaceably."). Plaintiffs argue that this case recognizes a right to go "on the upstream area of their grazing lands" to clear any obstructions, including riparian growth and beaver dams. P. Post Tr. Brief at 15. Defendant, on the other hand, incorrectly argues that the case represents a principal that the downstream user has the right only to remove unnatural obstacles placed in the channel by an upstream owner that divert or obstruct the flow of water. The Government's narrow interpretation is inconsistent with both the case law and logic.

As Plaintiffs are arguing that policies and procedures prevented their access, the Court turns to the *Penn Central* factors to determine whether the Government's actions amounted to a taking. First, Plaintiffs clearly had investment-backed expectations in the water rights as those rights had been purchased along with the Ranch. In an arid region such as central Nevada water is highly valuable and sought after. It gives the land most of the land's value. It is unreasonable to expect that Plaintiffs would even purchase the ranch without the water rights which gave it its value. The Government interfered with their expectations by allowing riparian growth to increase upstream and by preventing, through threats, Plaintiffs' access to the areas upstream to clear the obstructions in the water flow. The second factor, the character of the governmental action, is different for the riparian growth policy than for the threats. On one hand, there is no evidence that the policy that led to a proliferation of willows and other growth in the stream bed was malicious in nature. On the other hand, the threats and intimidation that pervaded the relationship between Plaintiffs and the Forest Service interfered with Plaintiffs' vested water rights by barring necessary maintenance. The third factor, the economic impact of the regulation on the claimant, leans decidedly against the

Government. The severe reduction in water flow to Plaintiffs' patented lands deprived them of the water they needed for irrigation making the ranch unviable and which they could have sold in the market.

Considering all three factors, the Court finds that the Government's actions had a severe economic impact on Plaintiffs and that the Government's actions rose to the level of a taking.

**E. 1866 Act Irrigation Ditches were Taken**

Plaintiffs offered evidence that had the Government not prevented their access to their various 1866 Act ditches, the water could have been put to use for agricultural purposes or could have been sold for quasi-municipal use, as discussed above. The Court finds that Plaintiffs could have put the water from their 1866 Act Irrigation Ditches to beneficial use for agricultural purposes. This Court has already held that "[t]he government cannot cancel a grazing permit and then prohibit the plaintiff from accessing the water to redirect it to another place of valid beneficial use. The plaintiffs have a right to go on land and divert the water." *Hage IV*, 51 Fed. Cl. at 584.

Plaintiffs argue that through intimidation, threats, indictment, and conviction[9], the Government prevented them from maintaining their ditches. P. Reply at 14. First, Plaintiffs argue that the threat of prosecution for trespassing on federal land kept Plaintiffs from accessing the ditches for maintenance. However, it was not only threats that kept Plaintiffs from their waters; the Forest Service informed Plaintiffs that only hand tools could be used for ditch maintenance. Defendant counters that Plaintiffs could have applied for a special use permit to perform anything beyond normal maintenance, which would include minor trimming and clearing of vegetation. *See Hage IV*, 51 Fed. Cl. at 584. Further, as the Court noted in *Hage IV*, the District Court in Nevada recognized, "a vested right-of-way which runs across Forest Service lands is nevertheless subject to reasonable Forest Service regulation, where 'reasonable' regulation is defined as regulation which neither prohibits the ranchers from exercising their vested rights nor limits their exercises of those rights so severely as to amount to a prohibition." *Id.*

The evidence is clear that the ditches to which Plaintiffs have established a property right were in need of routine maintenance. In order to access the water, trees and undergrowth had to be removed as well as roots, silt, and other deposits. The water areas had been clogged with pinion, pine, juniper, and willow. Plaintiffs' application for a special use permit to maintain their ditches with the appropriate equipment would clearly have been futile; the Forest Service had threatened to prosecute Plaintiffs for trespassing and had actually secured a conviction, which was later overturned by the Ninth Circuit. Based on the history between the Forest Service and Plaintiffs, the special use permit requirement for ditch maintenance rises to the level of a prohibition, and is therefore a taking of their property rights. Further, the hand tools requirement prevented all effective ditch maintenance, as it cannot be seriously argued that the work normally done by caterpillars and back

---

[9] *United States v. Seaman*, 18 F.3d 649 (9th Cir. 1994).

hoes could be accomplished with hand tools over thousands of acres. The Court visited many of these ditches and stream courses spread over thousands of acres. With hand tools the task would have taken years or decades and required hundreds of workers.

The Court must again turn to the *Penn Central* factors to inform its regulatory taking analysis. First, Plaintiffs had a significant investment-backed expectation in the ditches, as these were the primary means for conveyance of water for irrigating the Ranch. The ditches were rights purchased along with the Ranch. Second, Plaintiffs offered ample evidence that the Forest Service had engaged in harassment towards Plaintiffs[10], enough to suggest that the implementation of the hand tools requirement was based solely on hostility to Plaintiffs. Third, the economic impact of this regulation was considerable; it would have been economically impractical for Plaintiffs to hire enough men with hand tools to perform any sort of substantial work clearing the ditches. Plaintiffs had a right to effectively maintain their ditches, including the 50 foot wide rights-of-way on either side of the ditch beds.

Therefore, the Court finds that the Government's actions in both preventing access to the ditches and in limiting the maintenance to the use of hand tools constituted a taking of Plaintiffs' water rights in the 1866 Act ditches that have been previously identified.[11]

## V. Just Compensation

Where a taking has occurred, a plaintiff is entitled to just compensation. The fundamental principle of just compensation is reimbursement to the owner, so that he is put in as good a position pecuniarily as if his property had not been taken. *Coast Indian Community v. United States*, 550 F.2d 639, 647 (Ct. Cl. 1977). For purposes of just compensation, the Court must use the fair market value of the property at the time of the taking. *United States v. Miller*, 317 U.S. 369, 373 (1943). This is the amount that a willing buyer would pay a willing seller in an arm's length transaction. *See Shelden v. United States*, 34 Fed. Cl. 355, 365 (1995).

Possibly the most difficult step in the analysis is the amount of just compensation due to Plaintiffs. The amount of water that would have flowed to Plaintiffs' patented lands without the Government's actions must be estimated based on evidence produced at trial regarding the amount

[10] *See, e.g.* Tr. 292:15-293:5; *see also* Tr. 85:1-89:22.

[11] Plaintiffs also have a forage right in 50-foot wide rights-of-way on either side of each 1866 Act ditch. However, it would be economically unfeasible to graze cattle on the 100 foot wide strips while being unable to graze on land beyond that mark. Plaintiffs would have to erect a fence to keep cattle within this location and it is highly unlikely that there would be a willing buyer for the right to graze on that land. Therefore, the Court finds that Plaintiffs' claim for compensation for the taking of the forage in their 1866 Act ditch rights-of-way must be **DENIED**.

of water, in acre feet ("AF"), that would flow in the streams, creeks, wells, and pipelines to which Plaintiffs have established a property right that the Government has taken.

The Nevada State Water Engineer's office adjudicated water rights in Southern Monitor Valley, which lies at the northern end of the Ranch. The State Engineer determined the amount of Plaintiffs' water in Southern Monitor Valley to be 17,520.65 AF. P. Ex. 1136 at 31. In addition, Plaintiffs have established a right in 10 springs[12] on other parts of the ranch. Plaintiffs introduced evidence that the ranch springs can be estimated to produce 3 gallons per minute ("gpm") each, so the 10 springs would therefore produce 43,200 gallons per day. As there are 325,851 gallons in one acre foot of water, the 10 springs would produce .13 AF per day, or 47.45 AF per year.

Based on the evidence produced at trial, the Court finds that the total amount of acre feet of water was 17,520.65 AF plus 47.45 AF, for a total of 17,568.1 AF. As the Court previously stated, the probable beneficial use for the water was for agricultural use. The Court finds that the agricultural value of the water on the Pine Creek Ranch was $162.50 per acre foot in 1991, as shown by Plaintiffs' experts.

Thus, multiplying 17,568.1 AF by $162.50, the Court finds that Plaintiffs are entitled to the amount of **$2,854,816.20** for the value of their water rights.

## VI. Compensation under 43 U.S.C. § 1752(g)

Plaintiffs argue that they are entitled to compensation under 43 U.S.C. § 1752(g). The Act, in relevant part, provides:

> Whenever a permit or lease for grazing domestic livestock is canceled in whole or in part, in order to devote the lands covered by the permit or lease to another public purpose, including disposal, the permittee or lessee shall receive from the United States a reasonable compensation for the adjusted value, to be determined by the Secretary concerned, of his interest in authorized permanent improvements placed or constructed by the permittee or lessee on lands covered by such permit or lease, but not to exceed the fair market value of the terminated portion of the permittee's or lessee's interest therein.

43 U.S.C. § 1752(g).

[12] *See supra* notes 3-5; Combination Springs, Baxter Spring, Humphrey Spring, Snow Bird Spring, Spanish Spring, Stewart Spring, Caine Springs, Cedar Corral Springs, Mud Springs, Perotte Springs.

First, the Court must address Defendant's contention that Plaintiffs' claim for compensation under this section is not ripe. As the Court noted in *Hage I*, the ripeness doctrine obligates the Court to hear the case if "these plaintiffs will suffer real consequences if the court declines to consider the case." 35 Fed. Cl. at 162. In determining whether a case is ripe, the Court will consider "the hardship of the parties of withholding court consideration" and, second, "the fitness of the issues for judicial decision." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967).

Defendant argues that Plaintiffs have never applied to the "secretary concerned" for compensation, and thus their claim is not ripe. Defendant points the Court to *Julius Goldman's Egg City v. United States*, 556 F.2d 1096, 1097 (Ct. Cl. 1977). In *Egg City*, the relevant statute required the Secretary to compensate owners of destroyed animals "based upon the fair market value as determined by the Secretary." *Id.* In that case, the court found that the Secretary, not the trial court, should make that determination. However, in *Egg City* there were regulations detailing an appraisal process and outlining how owners of destroyed animals would be compensated. *Id.* at 1098. Plaintiffs point out that in this case, they were not aware of any procedure established by either the Department of Agriculture or the Forest Service to implement the provisions of 42 U.S.C. § 1752(g). The Forest Service manual simply sets forth a general statement of policy with respect to compensation, but does not establish how parties may seek that compensation.

The Court finds that since there was no clear procedure establishing how Plaintiffs might seek compensation for their range improvements they may pursue their claim in this forum. The issues of range improvements are fit for judicial decision through the evidentiary process, specifically through trial. In addition, withholding the Court's consideration at this point would impose upon Plaintiffs the hardship of attempting to determine how they would seek compensation in an appropriate agency, and considering the history of the Forest Service's relations with them, this claim would likely be futile.[13]

In *Hage I*, the Court stated that to prevail on their claim for compensation under 43 U.S.C. § 1752(g), Plaintiffs must demonstrate first, that defendant "actually cancelled the permit not to enforce the permit terms but rather to have access to the water and allotments for use by the Forest Service, elk, hunters, fishermen, or tourists." 35 Fed. Cl. at 179. Second, Plaintiffs must "demonstrate that such use actually does devote the allotment to another 'public purpose' within the meaning of 43 U.S.C. § 1752(g)." *Id.*

To prove that the land has been dedicated "to another public purpose," Plaintiffs presented evidence that first, the lands in question are clearly no longer being used for grazing. There had not been any authorized grazing on the Meadow Canyon, Table Mountain, and Monitor Allotments between the cancellation of Plaintiffs' grazing permit and the most recent trial, a period of thirteen years. The Meadow Canyon Allotment has been devoted to wildlife and recreational purposes. At the time of trial, the BLM had approved the applications of third parties for desert entries on the

---

[13] Further, the Court, while not addressing the ripeness issue, has already held that Plaintiffs may proceed with this claim here. *Hage I*, 35 Fed. Cl. at 179.

Ralston Allotment, for the purpose of growing irrigated crops there. Except for a temporary grazing permit issued by the Forest Service to a third party rancher, there was no cattle grazing on the McKinney Allotment between 1991 and trial. There has not been simply a cessation of grazing activities on these lands but active efforts to devote the lands to other activities. On the Meadow Canyon Allotment, a mountain bike trail has been constructed**.** The Court finds that the facts show that Meadow Canyon has been devoted to recreational activities. Further, the Court finds that as there has been no grazing on the Table Mountain Allotment since 1990, the allotment has been devoted to the public purpose of an elk preserve**.**

Plaintiffs also argue that they are entitled to compensation for both the improvements they constructed and the improvements they purchased along with the Ranch, which their predecessors had constructed. However, this claim goes against the plain language of the statute, which states that compensation is for "authorized permanent improvements placed or constructed *by the permittee*." 43 U.S.C. § 1752(g) (emphasis added). Where a statute is "clear and unambiguous" the Court "must give effect to the unambiguously expressed intent of Congress." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 290 (1988); *see also Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984). The Court finds that Plaintiffs are entitled to compensation for the improvements they constructed but not for the improvements constructed by their predecessors.

At trial, Mr. Hage testified to the improvements he made to the Pine Creek Ranch. Tr. 47:23. The improvements included: roads and trails, fences, a new spring box at Ice House Spring; a new ice box and piping system at Frazier's Hill; new piping at Ray's Well; a new spring box at Baxter Spring and Stewart Spring; an underground holding tank and pipeline at Spanish Spring; 1200 feet of piping at Pine Creek Well; new corrals and a loading shoot at Pine Creek Well; 1,000 gallon holding tank at AEC Well a new spring box at Clay Bank; and two water troughs on Upper Airport Pipeline.

The Court finds Plaintiffs are entitled to recover for the following improvements constructed by them: (1) 238 miles of fences, which represents eighty percent of the Ranch's fences; (2) 634 miles of established roads and trails (either built or extensively maintained by Plaintiffs; (3) 44.7 miles of ditches and pipelines; and (4) improvements at Ice House Spring, Frazier's Hill, Baxter Spring, Stewart Spring, Clay Well, Upper Airport Pipeline, and Pine Creek Well.

**1. Fences**

The evidence introduced at trial shows that there are approximately 298 miles of fences on the Ranch, of which eighty (80) percent, or 238 miles, were built by Plaintiffs within ten years prior to 1991. The average cost of constructing one mile of four-strand fence in central Nevada in 1991 was $4,000. Applying an adjustment of .95 for an estimated five percent physical deterioration of these newer fences, the Court finds that the replacement cost of the fences built by Plaintiffs was **$904,400.**

**2. Roads**

There are 634 miles of roads and trails on the Ranch, which range from two-lane graded roads to a horse pack trail. Plaintiffs offered evidence that considering the wide range of equipment, operator and fuel costs, and the amount of work associated with the varying conditions and terrain on the ranch, the average cost of constructing one mile of ranch road or trail, passable by a four-wheel drive pickup truck, is approximately $850 in 1991. Applying an adjustment of .85 for an estimated fifteen percent physical deterioration, the Court finds that the value of the ranch roads and trails was **$458,065**.

**3. Improvements to Springs and Wells**

Plaintiffs proved that they made improvements on 7 springs during the 10 years prior to 1991. The average value of physical improvements made to springs is approximately $500 per spring. Making an adjustment of .9 to consider deterioration at these springs and wells, the Court finds the value of the spring boxes and other improvements to be **$3,150**.

The Court finds that Plaintiffs are entitled to $904,400 for the value of fences, $458,065 for roads and trails, $3,150 for the value of improvements at seven springs and wells, for a total amount of $1,365,615

## VII. Conclusion

As the Court stated in *Hage I* and still firmly believes,

> The taking clause was not written to protect merely against frivolous exercises of governmental power, but more precisely to protect against the opposite. Presumably, the political process protects against most frivolous exercises. The protection of the Fifth Amendment is most needed to protect the minority against the exercise of governmental power when the need of government to regulate is greatest, and the desire of the popular majority is strongest. In this way, and in this way only, does the judiciary properly affect policy, and that effect is to adjudicate the limits that the rule of law and a written Constitution impose upon popular government. The existence of property rights, not the judiciary's finding of a "taking," impose these limits.

35 Fed. Cl. at 152.

Following this spirit, as well as the law and the evidence, the Court hereby finds that the Government's actions amount to a taking of Plaintiffs' property with respect to their surface water rights and their 1866 Act ditches. The Court further finds that the Government dedicated Plaintiffs' historical grazing lands to "another public purpose" for the purposes of 43 U.S.C. § 1752(g). Thus, Plaintiffs are hereby

**AWARDED** $2,854,816,20 for the value of their water rights plus $1,365,615 for the value of their improvements, for a total award of **$ 4,220,431.20**, plus interest from the date of the taking[14] and attorney's fees and costs under the Uniform Relocation Act, 42 U.S.C. § 4654(c).

**It is so ORDERED.**

s/Loren A. Smith
LOREN A. SMITH
SENIOR JUDGE

[14] When the government takes an individual's property, the owner "is entitled to interest thereon sufficient to insure that he is placed in as good of a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." *Kirby Forest Indus. Inc. v. United States*, 467 U.S. 1, 10 (1984); s*ee CCA Associates v. United States*, 75 Fed. Cl. 170, 204 (2007).