# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ESTATE OF E. WAYNE HAGE AND THE ESTATE OF JEAN N. HAGE,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendants. | No. 91-1470 L<br>Senior Judge Loren Smith |

## PLAINTIFFS' MOTION FOR RECONSIDERATION OF VALUATION OF WATER RIGHTS; IN THE ALTERNATIVE, MOTION FOR PREJUDGMENT INTEREST

## TABLE OF CONTENTS

**Page**

I. Introduction .......... 2
II. MOTION FOR RECONSIDERATION OF VALUATION OF WATER RIGHTS .......... 4
III. MOTION FOR PRE-JUDGMENT INTEREST .......... 13
IV. Conclusion .......... 20

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Air Line Ry.* v. *United States*
261 U.S. 299 (1923).......................................14

*Albrecht* v. *United States*
329 U.S. 599 (1947).......................................14

*Brown v. Legal Found.*
538 U.S. 216 (2003).......................................6

*CCA Assocs. v. United States*
75 Fed. Cl. 170 (Fed. Cl. 2007).......................................15

*Cienega Gardens v. United States*
67 Fed. Cl. 434 (Fed. Cl. 2005).......................................15

*County of Clark v. Alper*
100 Nev. 382 (1984).......................................17

*Estate of Muna v. Commonwealth*
2007 MP 16 (N. Mar. I. Aug. 14, 2007), .......................................10, 11

*Georgia-Pacific Corp. v. United States* 226 Ct. Cl. 95 (1980).......................................5, 7, 14

*Hage v. United States*
35 Fed. Cl. 147 (1996).......................................2

*Hage v. United States*
51 Fed. Cl. 570 (2002).......................................2

*Hage v. United States*
82 Fed. Cl. 202 (2008).......................................2

*In re Chittenden Solid Waste Dist.*
2007 VT 28,P33 (Vt. 2007), .......................................12

*ITT Corp. v. United States*
*17 Cl. Ct. 199* (Cl. Ct. 1989).......................................18, 19

*Independence Park Apts. v. United States*
61 Fed. Cl. 692 (Fed. Cl. 2004).......................................15

*Kirby Forest Industries, Inc. v. United States*
467 U.S. 1 (1984).......................................3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 16, 20

*Miller v. United States*
223 Ct. Cl. 352 (Ct. Cl. 1980).......................................6, 14, 16, 17

## TABLE OF AUTHORITIES
## (continued)


Page

*Monongahela Nav. Co. v. United States*
148 U.S. 312 (1893) .......... 6, 14

*United States v. Fuller*
409 U.S. 488 (1973) .......... 5

*Olson v. United States*
292 U.S. 246 (1934) .......... 5

*Phelps v. United States*
274 U.S. 341 (1927) .......... 5

*Seravalli v. United States*
845 F.2d 1571 (Fed. Cir. 1988) .......... 6

*Shelden v. United States*
7 F.3d 1022 (Fed. Cir. 1993) .......... 5, 6

*Seaboard ALR v. United States*
261 U.S. 299 (1923) .......... 4, 14, 15

*State, Dep't of Transp. v. Barsy*
113 Nev. 712 (1997) .......... 18, 19

*Tulare Lake Basin Water Storage Dist. v. United States*
61 Fed. Cl. 624 (2004) .......... 14, 15, 16, 18

*United States v. 59.34 Acres of Land*
1989 U.S. Dist. LEXIS 17976 (W.D. Mich. May 1, 1989) .......... 12

*United States v. Commodities Trading Corp.*
339 U.S. 121 (1950) .......... 6

*United States v. Virginia Electric & Power Co.*
365 U.S. 624 (1961); .......... 5

*United States v. 1.09 Acres of Land*,
657 F. Supp. 67 (S.D. Fla. 1987), .......... 11

*United States v. New River Collieries Co.*
262 U.S. 341(1923) .......... 6, 14

*Whitney Benefits v. United States*
30 Fed. Cl. 411 (Fed. Cl. 1994) .......... 19

*Yancey v. United States*
915 F.2d 1534 (Fed. Cir. 1990) .......... 5

# TABLE OF AUTHORITIES
(continued)

Page

**Statutes**

40 U.S.C. § 3114 .......... 6, 14
43 U.S.C § 258e-1 .......... 16
Fed. R. Civ. P. 60(b) .......... 10
NRS § 37.175 .......... 17
NRS §37.175 .......... 13
U.S.C. § 4654(c) .......... 3

## I. Introduction

This is an action brought by the Plaintiffs, Estate of E. Wayne Hage and Estate of Jean N. Hage ("Hage") on September 26, 1991 against the United States seeking recovery for just compensation under the Fifth Amendment for taking of their property. This litigation has taken seventeen (17) years to complete and was conducted in phases. *Hage I* (*Hage v. United States*, 35 Fed. Cl. 147 (1996)), was the defense of the Government's Motion for Summary Judgment. In *Hage II* (*Hage v. United States*, 35 Fed. Cl. 737 (1996)), the Court denied the motion of various state and private organizations to intervene, but granted *amici curiae* status. The property phase of the case was determined in *Hage IV* (*Hage v. United States*, 51 Fed. Cl. 570 (2002)) during a two-week trial. After another three-week trial was conducted, this Court in *Hage V* determined that the Governments' actions constituted a taking and awarded compensation. (*Hage v. United States*, 82 Fed. Cl. 202 (2008)).

At the time of the compensation phase of the trial in May 2004, Plaintiffs' experts testified that the value of the water rights in 1991, the date of the taking, was somewhere between $162.50 and $500.00 per acre foot ("af"). Angus P. McIntosh, Ph.D determined the value of the water for the "Highest & Best Use" was for quasi-municipal use. *See* Plaintiffs' Ex. 1131 at pp. 28-29. Using a sales comparison approach for the year 1991, Dr. McIntosh estimated the lower value of water for irrigation use to average $162.50 per af, and $500 per af for quasi-municipal use. *Id.* Another expert for Plaintiffs, Clare Mahannah, also used a comparison sales approach for quasi municipal use of related water rights throughout Nevada in 1991 and 2003. He estimated the value of the Hage water rights to be $500/af in 1991 and $750/af in

2003. Plaintiffs' Ex. 1136 at p. 31-32. On May 10, 2004, Mr. Clare Mahannah, who had roughly 40 years of experience in Nevada water law and policy at the time, also estimated the agricultural value of Hage's water rights to be $200-$300 per af. *See* May 10, 2004 Testimony at p. 1467. Finally, Plaintiffs argued in their closing argument in October 2004 that using the date of taking valuation after so much time had lapsed would not provide just compensation to plaintiffs and would provide a huge windfall to the United States.

Following post trial briefing and oral argument, the Court issued the June 6, 2008 Opinion and awarded Plaintiffs compensation for the Government's Taking of their property with respect to surface water rights and 1866 Ditch Right-of-Way Act ("1866 Act") ditches and improvements under 43 U.S.C. § 1752g. Plaintiffs were awarded a total recovery of $4,220,431.20, plus interest and attorney's fees and costs under 42 U.S.C. § 4654(c). On July 17, 2008 there was a Status Conference in this case wherein the Court determined that Plaintiffs shall file a motion for reconsideration on or before September 5, 2008.

This Motion for Reconsideration is filed for the purpose of asking the court to reconsider the value of the water rights at issue in this case from the time of the taking to the time of payment, as provided under *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1 (1984). It has been approximately seventeen years since the date of the taking in this case and over four years since the date of the trial on the liability and damages issues. Since the determination on the value of the water, water rights in central and eastern Nevada are now selling for at least $1200.00 per acre foot for use as agricultural water rights. *See* Exhibit A to the Declaration of Duane E. Webb

submitted herewith ("Duane Webb Report"). This is a significant increase even from the time of the trial in May 2004. Applying the $1200 per acre value to 17,568.1 acre feet would make the compensation for the water rights alone equal $21,081,720.00. Given the significant elapse of time, the fair market value of the water rights based upon the date of taking proven at trial does not satisfy the principles of just compensation. Thus, to ensure Plaintiffs are fully compensated for the taking of their water rights and that the Defendant does not receive a windfall resulting in the increased value of water, the Plaintiffs ask the court to reconsider the value of the water rights.

In the alternative, Plaintiffs ask the court to apply the "prudent investor standard" to this case for purposes of an interest calculation that would be applied to the entire amount of the award, including range improvements. In Nevada, the legislature has determined an interest rate of not less than the prime rate of interest plus 2 percent will make a plaintiff whole. *See Seaboard ALR v. United States,* 261 U.S. 299, 305 (1923) (state statutory interest rate applied to achieve just compensation). A copy of the Nevada statutes and the interest schedule from Nevada are attached as Attachment A. Although the Nevada interest rate does not come close to matching the increase in water values in central Nevada, it does provide a local indication of a rate of return for a prudent investor. As such, Hage requests that if the court decides not to revalue the water rights, that the interest rate of prime rate plus 2 percent be applied to the judgment in order to ensure adequate compensation for the taking of Hage's water rights.

## II. MOTION FOR RECONSIDERATION OF VALUATION OF WATER RIGHTS

The purpose of awarding just compensation is to put the owner in as good a

position pecuniarily as if the use of the owner's property had not been taken. *Phelps v. United States*, 274 U.S. 341, 344 (1927); *Olson v. United States*, 292 U.S. 246, 255 (1934). Generally, when the government has taken private property for a public use, the Fifth Amendment requires compensation in the amount of the market value of the property on the date it is appropriated. *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1, 10 (1984) ("*Kirby*"). This concept is also generally applied in the Court of Appeals for the Federal Circuit. *See Yancey v. United States*, 915 F.2d 1534, 1543 (Fed. Cir. 1990) ("Fair market value under the Fifth Amendment is *normally* ascertained at the date the governmental restrictions are imposed, which is the date of the taking.") (emphasis added); *see also Shelden v. United States*, 7 F.3d 1022, 1031 (Fed. Cir. 1993) ("Just compensation for a plaintiff in a takings case is *typically* defined as the fair market value of the property on the date it is appropriated.") (emphasis added).

However, "[t]he constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness, as its does from technical concepts of property law." *United States v. Fuller*, 409 U.S. 488, 490 (1973) (internal cites omitted). There is not an absolute standard nor an exclusive method of valuation in condemnation actions. *United States v. Virginia Electric & Power Co.*, 365 U.S. 624, 633 (1961); *see also Georgia-Pacific Corp. v. United States*, 226 Ct. Cl. 95, 107 (Ct. Cl. 1980) ("the determination of just compensation is not confined to any rigid formula, inexorable rules, or method.")

> We are unwilling to restrict the trial courts to any single basis for determining fair market value. Those courts necessarily must have considerable discretion to select the method of valuation that is most appropriate in the light of the facts of the particular case. It may be a single method or some combination of different methods.

*Seravalli v. United States*, 845 F.2d 1571, 1575 (Fed. Cir. 1988). There are two general situations in which this standard is not to be used: when market value is too difficult to ascertain, and when payment of market value would result in manifest injustice to the owner or the public. *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123 (1950); *Kirby*, 467 U.S. at 10, n.14.; *Brown v. Legal Found.*, 538 U.S. 216, 244 (2003) (Justices Scalia and Kennedy dissenting).

The determination of just compensation under the fifth amendment is exclusively a judicial function. *Miller v. United States*, 223 Ct. Cl. 352, 399-400 (Ct. Cl. 1980). Although, the general rule is that fair market value is ascertained at the date the governmental restrictions are imposed (*Shelden v. United States*, 7 F.3d at 1031), there is no indication that this is the exclusive date of valuing property. The Declaration of Taking Act (40 U.S.C. § 3114) indicates that the judgment shall include interest "on the amount finally awarded as the value of the property as of the date of taking . . ." However, Congress does not have the authority to determine what compensation shall be paid, or even what shall be the rule of compensation. *United States v. New River Collieries Co.*, 262 U.S. 341, 343-44 (1923); *Monongahela Nav. Co. v. United States*, 148 U.S. 312, 327 (1893). The determination of just compensation is strictly a judicial function and considerations of equity in each case must be evaluated. Further, the Declaration of Takings Act appears to be limited to the timing of interest and can not interfere with the court's equitable consideration of the timing of valuing the property. Plaintiffs have researched the case law in the Court of Appeal for the

Federal Circuit, and although there is a general rule that fair market value is normally ascertained at the date the governmental restrictions are imposed, there is no indication that this is a strict rule, or that it impairs the court's equitable powers to value the property at another time to put the owner in as good a position as if the property had not been taken. In fact, *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1 (1984) ("*Kirby*") and its progeny, discussed below, specifically allowed re-valuation of the taken property, especially when there is a delay between the time of valuation and the time of payment.

Here, from the time of the taking in 1991 to the time of the compensation phase of the trial, the value of water rights rose from a minimum of $162.50 to $750.00 per af. However, since 2004 the value of agricultural water rights has risen even more dramatically, from $750.00 per af to over $1200.00 per af. *See* Duane Webb Report; Exhibit A to Webb Declaration. There are several reasons for this dramatic rise, not the least of which is that several new buyers entered the arena between 2004 and 2008. These new buyers are seeking to use water for agricultural purposes, and there is an extreme scarcity of water rights for sale. *Id.* Due to the dramatic increase in the value of the Hage water rights, the only way to put Hage in as good a position pecuniarily as if the water rights had not been taken is to revalue the water rights. If the water rights were not taken there can be no doubt as to their present worth. It is manifestly unjust to provide the Defendant a benefit resulting from the delay in payment and the dramatic increase in the value of water rights. The risk in delay in payment should be borne by the Defendant. *Georgia-Pacific Corp. v. United States*, 226 Ct. Cl. 95, 154 (1980). No rate of prejudgment interest can provide the equivalent of the increased value of water

in central Nevada. Here, equitable considerations would dictate that the United States not receive the windfall as a result of the escalating water values.

In *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1 (1984) ("*Kirby*"), the Supreme Court addressed the issue of valuation of the fair market value of property when a considerable amount of time had passed. In *Kirby* the United States sought to appropriate timber lands from the property owner and filed a complaint in condemnation on August 21, 1978. The District Court referred the matter to a special commission to ascertain the compensation due petitioner. The trial before the commission began on March 6, 1979, which is the date the parties stipulated as the date the land was to be valued. Based on a commissioner recommendation on the amount of just compensation, the district court entered judgment in the amount of $2,331,202, plus 6% interest for the period from the date the complaint was filed to the date the government deposited the amount of the award into court, which was March 26, 1982. On appeal, the Fifth Circuit Court of Appeals reversed the award of interest to the petitioner because in a straight condemnation there is no taking until the government enters into possession.

The Supreme Court agreed with the appellate court and found that prior to the payment of the condemnation there was not an interference with the owners property interests severe enough to give rise to a taking. However, the Supreme Court still had to determine if the award satisfied the Fifth Amendment. The property owner argued that while $2,331,202 represented the value of the land on March 6, 1979 (the date of trial and date of valuation), it did not represent the value of the land on March 26, 1982, the date of payment. The Supreme Court agreed and found that:

> [h]owever reasonable it may be to designate the date of the trial as the date of valuation, if the result of that approach is to provide the owner substantially less than the fair market value of his property on the date the United States tenders payment, it violates the Fifth Amendment.

*Id.* at 17.

The land owner next argued that the court should mandate an award of interest from the date of valuation to the date of the taking. The *Kirby* court rejected the idea of a mandated amount of interest for all condemnations because:

> [c]hange in the *market value of particular tracts of land over time bears only a tenuous relationship to the market rate of interest.* Some parcels appreciate at rates far in excess of the interest rate; others decline in value.

*Id.* at 17 (emphasis added). In addition, the *Kirby* court acknowledged that value could be affected by other issues, such as an expansion of residential areas surrounding the condemned land at issue. *Id.* at 18 n. 28. The Supreme Court went on to propose a remedy for the gap in just compensation.

> Solution of the problem highlighted by petitioner requires, not a rule compelling payment of interest by the Government, but rather a procedure for modifying a condemnation award when there is a substantial delay between the date of valuation and the date the judgment is paid, during which time the value of the land changes materially. In the case before us, such a procedure is readily available. In view of the inadequacy of the commission's explanation for its valuation of petitioner's land, the Court of Appeals remanded for reconsideration of the value of the property. On remand, the District court can easily adduce evidence pertaining to alteration in the value of petitioner's tract between March 6, 1979 and March 26, 1982. In our view, such a reassessment is both necessary and sufficient to provide petitioner just compensation.

*Id.* at 17-18. The Supreme Court discussed a procedure which could modify a condemnation award when there was a "substantial delay between the date of valuation

and the date the judgment is paid, during which time the value of the land changes materially." *Id.* at 18. The Court suggested that a Fed. R. Civ. P. 60(b) is expansive enough to allow limited evidence "on the issue of how the market value of the property altered between the date of the original valuation and the date on which the judgment was paid by the Government." *Id.* at 19.

Here, as in *Kirby* there has been a "substantial delay between the date of valuation and the date the judgment is paid, during which time the value of the [property] changes materially." *Id.* at 17. The "[c]hange in the market value of [the water right] over time bears only a tenuous relationship to the market rate of interest. *Id.* Finally, as in *Kirby*, the Court can easily adduce evidence pertaining to alteration in the value the property between the date of valuation and the date of payment. *Id.* at 18.

A number of courts have followed *Kirby,* and present factual and legal themes in common with Hage; each include potential property appreciation which occurred during a delay in payment of compensation following the date of valuation. In a Supreme Court case from the Northern Mariana Islands, *Estate of Muna v. Commonwealth*, 2007 MP 16 (N. Mar. I. Aug. 14, 2007), the plaintiff landowner brought an inverse condemnation proceeding against defendant Commonwealth of the Northern Mariana Islands. The inverse condemnation proceeding commenced in 1971 and the trial court found that the defendant was responsible for compensating the land owner for the fair market value in 1976, the date the land was demeaned to be taken. On appeal of summary judgment in favor of defendant, the property owner and defendant argued that different statutory interest rates should apply. The court however found "that none of these statutes should be applied across the board to an inverse condemnation

proceeding. Instead, it is necessary to make the land owner whole, which requires a broader examination of the value of the land . . ." *Id.* at 15. The situation in *Estate of Muna,* as with Hage, is "that [the property] was taken first, before any notice or trial, and so the difference in value lies in the difference between the time the land was physically taken and the time of the payment which should be made at present." *Id.* at 16. Citing to *Kirby*, the court determined that "[v]aluation is determined both by the value at the actual time of the physical taking as well as the time of the payment for the taking." *Id.* at 17*; citing Kirby,* 467 U.S. at p.17. While, the court believed that a prejudgment interest rate based on the reasonable prudent investor standard made sense, it also believed "that a final award should bear some relation to the current value of the property." *Id.* at 19; *citing Kirby*, 467 U.S. at 17. Thus, the court remanded the case, instructing the trial court to examine the *current* value of the property as well as the amount of money the land owner could have obtained by prudently investing the proceeds at the date of the taking.

Several other courts have remanded cases for a determination of the value of property from the date of valuation to the date of payment. In *United States v. 1.09 Acres of Land*, 657 F. Supp. 67 (S.D. Fla. 1987), the federal district court for the Southern District of Florida held that a United States Land Commission was required to consider the effect of a proposed local building variance on the value of the property at issue. The variance was granted after the Land Commission's valuation hearing. The landowner claimed that the tracts may have been undervalued because of a material change in circumstance that occurred between the date of valuation and the date of payment. Citing to *Kirby*, the court found that the "Supreme Court has directed that

lower courts ensure that the compensation paid the owner of condemned land does not fall substantially below the fair market value of the property on the date of the taking." *Id.* at 69-70. Thus, the court directed the Land Commission to reopen the trial, "taking such further evidence as is necessary to value the best and highest use of the property" based on the building variance. *Id.* at 70.

In *United States v. 59.34 Acres of Land*, 1989 U.S. Dist. LEXIS 17976 (W.D. Mich. May 1, 1989), the United States filed an action for condemnation against defendant's land. A commission was appointed for the purpose of making a determination of just compensation. Defendant landowners filed objections to the commission's supplemental report. The landowners also filed a motion seeking to have just compensation updated to reflect market gains which have occurred between the time the testimony was presented to the commission and the present. The court determined due to the "substantial delay" of two years since the date of valuation and date of payment, "the parties will be permitted to present additional evidence on the issue of alteration in value of the subject property from the date of valuation to the date the judgment is paid." *Id*, at *24. Likewise in *In re Chittenden Solid Waste Dist.*, 2007 VT 28,P33 (Vt. 2007), the Vermont Supreme Court also adopts the *Kirby* procedure, as a two step process.

> In the first, the property owner must demonstrate to the court that grounds exist to grant relief from judgment under Rule 60(b)(6): that is, that there has been a material change in the value of the property between the date of the valuation and the date of the tender of compensation. Assuming that the court finds grounds for relief, the narrow question of the increase in value can be submitted to the jury.

*Id.*

Here, there has been a substantial increase in the value of the Hage water rights. At the time of the damages phase of the trial in May 2004, Plaintiffs' experts testified that the value of the water rights for irrigation in 1991 between $162.50 and $300 per acre foot. Now these rights are worth $1200 per acre foot. *See* Duane Webb Report, Exhibit A to Webb Declaration. The approach of designating the date of the taking as the date of valuation will provide Hage substantially less than the fair market value of his water rights on the date the United States tenders payment, and thus violates the Fifth Amendment. *See Kirby,* 467 U.S. at 17. This is not a situation where simply applying interest to the award will make Hage whole, because the change in the market value of the Hage water rights "over time bears only a tenuous relationship to the market rate of interest." *Id.* Thus, due to the substantial delay between the date of valuation and the date the judgment will be paid, during which time the value of the water rights changed materially, Plaintiffs request the Court modify its award.

## III. MOTION FOR PRE-JUDGMENT INTEREST

Although Plaintiffs do not believe that an award of interest will adequately compensate them for the taking of their water rights, if this court elects not to reconsider the valuation of the water, then the Plaintiffs hereby request prejudgment interest as a component of just compensation for the entire award, including the range improvements. Further, Plaintiffs request an interest rate commensurate with the standard rate of interest in judicial proceedings in Nevada, including the interest rate for condemnation actions. NRS §37.175 (Attachment A). The rate of prime rate plus 2 percent is a good indication of a local rate of return for a reasonably prudent investor

and should be applied in this case.

Just compensation in the constitutional sense has been held to include interest for delay in payment from the date of taking to the date of payment. *Albrecht* v. *United States,* 329 U.S. 599, 602 (1947); *Seaboard Air Line Ry.* v. *United States,* 261 U.S. 299 (1923) (applying a state statutory rate of interest to a condemnation award). It is the economic circumstances of the time intervening the taking and payment that determine the appropriate interest rate. *Miller v. United States*, 223 Ct. Cl. 352, 401 (Ct. Cl. 1980); *Georgia-Pacific Corp. v. United States*, 226 Ct. Cl. 95, 154 (Ct. Cl. 1980). The determination of just compensation under the fifth amendment is exclusively a judicial function. *United States v. New River Collieries Co.*, 262 U.S. 341, 343-44 (1923); *Monongahela Nav. Co. v. United States*, 148 U.S. 312, 327 (1893). Congress does not have the authority to determine what compensation shall be paid, or even what shall be the rule of compensation. *Id.* Thus, statutory interest rates, such as those found in the Declaration of Taking Act (40 U.S.C. § 3114), have been found to set a floor on the rate of interest payable rather than a ceiling. *Miller v. United States*, 223 Ct. Cl. 352, 400 (Ct. Cl. 1980). However, the rate of interest set by a statute can be applied to a claim for just compensation if such rate is reasonable and judicially acceptable." *Id.* Finally. "[t]he Government, not the unwilling condemnee, should be the one to bear the risk of any fluctuations in interest rates." *Miller v. United States*, 223 Ct. Cl. 352, 403 (Ct. Cl. 1980)

There is no consensus with regard to the appropriate interest rate to be employed in just compensation cases. *Tulare Lake Basin Water Storage Dist. v. United States*, 61 Fed. Cl. 624, 627 (2004). However, there has developed a pattern in the Court of Federal Claims to apply the "prudent investor rule." *Id*; *see also Independence*

*Park Apts. v. United States*, 61 Fed. Cl. 692, 716-717 (Fed. Cl. 2004) (reversed on other grounds by: *Independence Park Apts. v. United States*, 449 F.3d 1235 (Fed. Cir. 2006)); *Cienega Gardens v. United States*, 67 Fed. Cl. 434, 492-493 (Fed. Cl. 2005) (vacated on other grounds by: *Cienega Gardens v. United States*, 503 F.3d 1266 (Fed. Cir. 2007)); *CCA Assocs. v. United States*, 75 Fed. Cl. 170, 205 (Fed. Cl. 2007) (vacated on other grounds in part by: *CCA Assocs. v. United States*, 2008 U.S. App. LEXIS 15477 (Fed. Cir. July 21, 2008)). The prudent investor rule measures "how a reasonably prudent person' would have invested the funds to produce a reasonable return while maintaining safety of principal." *Id.*

In *Tulare Lake Basin Water Storage Dist. v. United States*, 61 Fed. Cl. 624 (Fed. Cl. 2004) ("*Tulare Lake")*, the court adopted state sanctioned accounts as a local indication of an appropriate rate of return for a prudent investor. *See also Seaboard A. L. R. Co. v. United States*, 261 U.S. 299, 306 (1923)

> The legal rate of interest, as established by the South Carolina statute was applied in this case. This was a palpably fair and reasonable method of performing the indispensable condition to the exercise of the right of eminent domain, namely, of making just compensation for the land as it stands, at the time of taking.

*Id.* (internal quotes omitted). In *Tulare Lake,* plaintiffs were California water users who claimed that their contractually-conferred right to the use water was taken from them when defendant United States imposed water use restrictions under the Endangered Species Act. The court awarded plaintiffs just compensation for the taking of their water, which included an interest component based on the 52 week Treasury bill rate,

as set forth in the Declaration of Takings Act 43 U.S.C § 258e-1.[1] Plaintiffs filed a motion for reconsideration, arguing that, because several years had elapsed between the taking and the award of compensation, the 52 week Treasury rate was inappropriate and did not provide them with full compensation for the taking of their property as required by the Fifth Amendment. Plaintiffs requested the court instead apply either the local agricultural operating loan rates or the local rates of return achieved on investments made during that same time frame pursuant to California law.

The *Tulare Lake* court found that although there is no consensus with regard to the appropriate interest rate to be employed in just compensation cases, courts have universally sought to honor two basic principles in calculating interest. *Tulare Lake*, 61 Fed. Cl. at 627. First, to "ensure that the property owner is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." *Id*, *citing Kirby*, 467 U.S. at 10. Second, a "strong judicial policy in favor of the establishment of a uniform rate of interest applicable to condemnation cases in order to avoid discrimination among litigants." *Id*; *citing Miller v. United States*, 620 F.2d 812, 838, 223 Ct. Cl. 352 (Ct. Cl. 1980). The court adopted the Ninth Circuit's "prudent investor rule," and found that the best measure of compensation "is the rates of return achieved on plaintiffs' state-sanctioned accounts--accounts whose mix of investment instruments, we believe, provides a reasonable rate of return consistent with a high level of safety." *Id*, 61 Fed. Cl. at 628. The reason for adopting the state sanctioned accounts is to avoid "complex factual assessment requiring fairly extensive speculation, and to avoid the award of non-uniform damages based on the water contractors' individual experiences." *Id. at* 629; *citing Miller v. United States*, 620 F.2d at 838. The

[1] Nearly identical language from the Declaration of Takings Act is now found at 40 U.S.C. 3116.

court rejected the government's request to apply the 52-week Treasury bill rate for three reasons. First, the Declaration of Takings Act was not intended to apply "to any other situation then a formal declaration of taking." *Id.* at 629. Second, the act was not intended to apply when "significant amount of time has elapsed between the taking of the property and the payment of just compensation." *Id.* at 629-630. Finally, "the 52-week Treasury bill rate contemplates an award of just compensation from the perspective of the government's cost of borrowing rather than from the perspective of the claimant's rate of return." *Id.* at 630.

Here, Hage also proposes that this Court use a state sanctioned prejudgment interest rate. Nevada's eminent domain statutes provides a "rate of interest to be used to compute the award of interest, which must not be less than the prime rate of interest plus 2 percent." NRS § 37.175. This interest rate is applied to inverse condemnation actions, it is considered the floor on the rate of interest allowed, and "can be applied to a claim for just compensation if such rate is reasonable and judicially acceptable." *County of Clark v. Alper*, 100 Nev. 382, 394 (1984), 685 P.2d 943, 951; *quoting Miller v. United States*, 620 F.2d 812, 837 (Ct. Cl. 1980). Ultimately, the court must determine an award on interest "which will put the person from whom the property is taken in as good a position monetarily as if the property had not been taken." NRS 37.175(4).

The prime plus two percent interest rate was first enacted in 1987 and applies to a number of judgments in Nevada. *See* NRS 17.130 (computation of amount of judgment in civil practice); NRS 99.040 (commercial transaction rates of interest not otherwise provided by contract); NRS 147.220 (interest on claims against a decedent's estate); NRS 233.170 (interest on back pay for unlawful employment practices). It was

enacted because the Nevada legislature believed that a "fluctuating interest rate would be more equitable" than the flat 12 percent statutory interest rate applicable at the time. Minutes of the Nevada Senate Committee on Judiciary, April 8, 1987, at p. 1296, Attachment B. The preferred method of ensuring the interest rate fluctuates with the market was to incorporate the prime rate plus two percent. *Id.* at 1296-1297. In 2007 the interest rate for the Nevada eminent domain statute was changed from a United States Treasury bill interest rate to the prime rate plus 2%. However, it was used in inverse condemnation cases in Nevada prior to this time because

> interest of prime plus two comes reasonably close to anticipating what property owners would have done with the money. The prime rate itself is a bank rate that is charged to a bank's best customer. Adding two percent for that allows for several things. One, a longer duration of the loan, which would be equivalent to the time it typically takes in one of these cases for the issue to be resolved, and two, also to allow for greater risk that's associated with an owner owning property particularly for business purposes.

*State, Dep't of Transp. v. Barsy*, 113 Nev. 712, 718, 941 P.2d 971 (1997)

As in *Tulare Lake,* the state sanctioned interest rate should be applied here. It is a uniform rate that would apply to anyone in similar situation. It awards just compensation based on the perspective of the claimant's rate of return, rather than from the perspective of the government's cost of borrowing. It can be applied even though a significant amount of time has elapsed between the taking of the property and the payment of just compensation. Most importantly, it provides the most equitable method of determining interest in this case. *See ITT Corp. v. United States, 17 Cl. Ct. 199, 236* (Cl. Ct. 1989) ("This court is of the opinion that the goal of establishing a uniform policy regarding delay compensation in eminent domain cases, although desirable, must give

way to the established law that there is no fixed formula for establishing compensation for fifth amendment takings. Courts have stepped outside the uniform policy when the requirements of justice so dictated.")(internal cites omitted).

The prime rate plus two percent comes "reasonably close to anticipating what property owners would have done with the money," and "allow for greater risk that's associated with an owner owning property particularly for business purposes." *State, Dep't of Transp. v. Barsy*, 113 Nev. 712, 718, 941 P.2d 971 (1997). Here, Hage was operating a ranching operation which was negatively impacted during the time the Defendant took Hage's use of and access to water rights. Hage for a period of approximately seventeen years has been deprived of the use and access of their water rights. Hage was in an unenviable situation; they could neither use their water rights to operate the ranching business economically nor obtain the worth of the property rights. *See Whitney Benefits v. United States*, 30 Fed. Cl. 411, 414-415, FN (Fed. Cl. 1994) ("A property owner cannot reinvest the increased values of his property when he possesses neither his property nor its monetary worth."); *citing ITT Corp. v. United States*, 17 Cl. Ct. 199, 240 (1989). As set forth in Plaintiffs' Post-trial Brief (pages 11 - 17), substantial evidence was presented at trial documenting the negative impact to the ranching operation by the defendant's interference with the Hage water rights. As a result of the taking of the water rights the amount of patented pastures that could be irrigated was decreased dramatically to the point that the Hages could only raise a few head of cattle and could not operate an economically viable livestock operation. Now as a result of the delay in payment, Hage will not see the benefit of escalating water values. In order to make the Plaintiffs whole, the court should apply the Nevada sanctioned interest rate

on judgments of prime rate plus two percent.

When Hage first obtained the ranch it was secured by a Promissory Note dated June 8, 1978. (Attachment C) Due to the impact in the ranching business from the taking of the water rights and the associated litigation, Hage went into default on the promissory note. On April 22, 1996 Hage entered into an Agreement to assign the interest in the promissory note to John S. Nichols and Bonnie Nichols, the brother and sister-in-law of Jean N. Hage. (Attachment D) The Agreement defers payment on the note until 40 days after the conclusion of this litigation, including payment of interest on the $700,866.88 balance of nine and one-half percent (9 1/2%) per annum. From a business standpoint it would make no sense for Hage, if compensated at the time of the taking, to invest in any rate of interest in an amount of less then nine and one-half percent (9 1/2%) per annum. The prime interest rate plus 2 percent presents a good indication of how a prudent investor running a business operation would treat a judgment. The average rate on interest under Nevada's statutory scheme for the period of the taking of water rights in this case is 9.09 percent.

## IV. Conclusion

Due to the escalated prices for water rights in central Nevada, awarding Hage a present value of $162.50 per acre foot based on 1991 date of the trial will provide Hage "substantially less than the fair market value of his property on the date the United States tenders payment" and thus would violate the Fifth Amendment. *Kirby*, 467 U.S. at p.17. Applying interest to the award can not correct the situation because the change in the market value of water bears no relationship to the market rate of interest. *See Id.* The United States should not benefit and receive a windfall from the dramatically

increased water values, and the Court should re-value the water rights at their present value. In the alternative, Plaintiffs request that the Nevada State sanctioned interest rate be applied to the entire compensation amount as an indication of how a reasonably prudent investor would manage such a judgment. The Nevada interest rate of prime plus two percent should be applied in this case.

Dated: September 5, 2008

By: /S/ Lyman Bedford

Lyman D. Bedford, Bar No. 40665
HANSON BRIDGETT LLP
80 E. Sir Francis Drake Blvd., Suite 3E
Larkspur, CA 94939
Telephone: (415) 925-8400
Facsimile: (415) 925-8409

Michael J. Van Zandt
Of Counsel

Attorneys for Plaintiff
E. WAYNE HAGE AND THE ESTATE OF
JEAN H. HAGE

CERTIFICATE OF SERVICE

At the direction of the Attorney of Record or his designee, on the date designated below, I served the within **PLAINTIFFS' MOTION FOR RECONSIDERATION OF VALUATION OF WATER RIGHTS; IN THE ALTERNATIVE, MOTION FOR PREJUDGMENT INTEREST and DECLARATION OF DUANE E. WEBB IN SUPPORT OF PLAINTIFF'S MOTION FOR RECONSIDERATION OF VALUATION OF WATER RIGHTS; IN THE ALTERNATIVE, MOTION FOR PREJUDGMENT INTEREST** on the interested parties in this action by first class mail as follows:

Michael Wolz
Nevada Attorney General's Office
100 North Carson Street
Carson City, NV 89701-4717

Dated: September 5, 2008

Keith Kiley

# ATTACHMENT A

# PRIME INTEREST RATE

**NRS 99.040(1)** requires:
*"When there is no express contract in writing fixing a different rate of interest, interest must be allowed at a rate equal to the prime rate at the largest bank in Nevada, as ascertained by the Commissioner of Financial Institutions, on January 1, or July 1, as the case may be, immediately preceding the date of the transaction, plus 2 percent, upon all money from the time it becomes due, . . . "**
Following is the prime rate as ascertained by the Commissioner of Financial Institutions:

| | | | |
|---|---|---|---|
| January 1, 2008 | 7.25% | July 1, 2008 | 5.00% |
| January 1, 2007 | 8.25% | July 1, 2007 | 8.25% |
| January 1, 2006 | 7.25% | July 1, 2006 | 8.25% |
| January 1, 2005 | 5.25% | July 1, 2005 | 6.25% |
| January 1, 2004 | 4.00% | July 1, 2004 | 4.25% |
| January 1, 2003 | 4.25% | July 1, 2003 | 4.00% |
| January 1, 2002 | 4.75% | July 1, 2002 | 4.75% |
| January 1, 2001 | 9.50% | July 1, 2001 | 6.75% |
| January 1, 2000 | 8.25% | July 1, 2000 | 9.50% |
| January 1, 1999 | 7.75% | July 1, 1999 | 7.75% |
| January 1, 1998 | 8.50% | July 1, 1998 | 8.50% |
| January 1, 1997 | 8.25% | July 1, 1997 | 8.50% |
| January 1, 1996 | 8.50% | July 1, 1996 | 8.25% |
| January 1, 1995 | 8.50% | July 1, 1995 | 9.00% |
| January 1, 1994 | 6.00% | July 1, 1994 | 7.25% |
| January 1, 1993 | 6.00% | July 1, 1993 | 6.00% |
| January 1, 1992 | 6.50% | July 1, 1992 | 6.50% |
| January 1, 1991 | 10.00% | July 1, 1991 | 8.50% |
| January 1, 1990 | 10.50% | July 1, 1990 | 10.00% |

*** Attorney General Opinion No. 98-20:**

*If clearly authorized by the creditor, a collection agency may collect whatever interest on a debt its creditor would be authorized to impose. A collection agency may not impose interest on any account or debt where the creditor has agreed not to impose interest or has otherwise indicated an intent not to collect interest. Simple interest may be imposed at the rate established in NRS 99.040 from the date the debt becomes due on any debt where there is no written contract fixing a different rate of interest, unless the account is an open or store accounts as discussed herein. In the case of open or store accounts, interest may be imposed or awarded only by a court of competent jurisdiction in an action over the debt.*

Posted 6/26/2008

Case 1:91-cv-01470-LAS Document 320 Filed 09/05/2008 Page 29 of 46

**NRS 99.040 Interest rate when not fixed by express contract for certain types of transactions.**

1. When there is no express contract in writing fixing a different rate of interest, interest must be allowed at a rate equal to the prime rate at the largest bank in Nevada, as ascertained by the Commissioner of Financial Institutions, on January 1 or July 1, as the case may be, immediately preceding the date of the transaction, plus 2 percent, upon all money from the time it becomes due, in the following cases:

(a) Upon contracts, express or implied, other than book accounts.

(b) Upon the settlement of book or store accounts from the day on which the balance is ascertained.

(c) Upon money received to the use and benefit of another and detained without his consent.

(d) Upon wages or salary, if it is unpaid when due, after demand therefor has been made.

➥ The rate must be adjusted accordingly on each January 1 and July 1 thereafter until the judgment is satisfied.

2. The provisions of this section do not apply to money owed pursuant to chapter 624 of NRS which is governed by the provisions of NRS 624.630.

3. As used in this section, "book account" means a detailed statement which:

(a) Constitutes the principal record of one or more transactions between a debtor and a creditor arising out of a contract or some fiduciary relationship;

(b) Shows the debits and credits in connection with that contract or fiduciary relationship and shows against whom and in favor of whom entries are made;

(c) Is entered in the regular course of business as conducted by such creditor or fiduciary; and

(d) Is kept in a reasonably permanent form and manner:

(1) In a bound book;

(2) On a sheet or sheets fastened in a book or to backing but detachable therefrom;

(3) On a card or cards of a permanent character; or

(4) In any other reasonably permanent form and manner.

[4:34:1861; A 1887, 82; 1917, 351; 1919 RL § 2499; NCL § 4322]—(NRS A 1979, 830; 1981, 1859; 1983, 426; 1987, 558, 940; 2001, 1625; 2005, 1735, 1856)

Case 1:91-cv-01470-LAS Document 320 Filed 09/05/2008 Page 30 of 46

**NRS 17.130 Computation of amount of judgment; interest.**

1. In all judgments and decrees, rendered by any court of justice, for any debt, damages or costs, and in all executions issued thereon, the amount must be computed, as near as may be, in dollars and cents, rejecting smaller fractions, and no judgment, or other proceedings, may be considered erroneous for that omission.

2. When no rate of interest is provided by contract or otherwise by law, or specified in the judgment, the judgment draws interest from the time of service of the summons and complaint until satisfied, except for any amount representing future damages, which draws interest only from the time of the entry of the judgment until satisfied, at a rate equal to the prime rate at the largest bank in Nevada as ascertained by the Commissioner of Financial Institutions on January 1 or July 1, as the case may be, immediately preceding the date of judgment, plus 2 percent. The rate must be adjusted accordingly on each January 1 and July 1 thereafter until the judgment is satisfied.

[1911 CPA § 329; RL § 5271; NCL § 8827]—(NRS A 1979, 830; 1981, 1858; 1987, 940)

**NRS 37.175 Interest paid by plaintiff; posttrial hearing to determine award of interest.**

1. Except as otherwise provided in this section, the plaintiff shall pay interest on the final judgment on the difference between the amount deposited pursuant to NRS 37.100 or 37.170 and the sum of the amount awarded for the taking and any damages awarded for the severance of the property, excluding costs and attorney's fees, from the date ordered by the district court pursuant to paragraph (a) of subsection 4 until the date the judgment is satisfied, at the rate provided in paragraph (b) of subsection 4.

2. The plaintiff is not required to pay interest on any amount deposited pursuant to the provisions of NRS 37.100 or 37.170.

3. No interest is required to be paid for the period from the date of a trial which is continued past 2 years after the date of the first service of the summons, until the date of entry of judgment, if the continuance was caused primarily by the defendant or, if there is more than one defendant, the total delay caused by all the defendants. As used in this subsection, "primarily" means the greater amount, quantity or quality of acts of the plaintiff or the defendant or, if there is more than one defendant, the total delay caused by all defendants, that would cause the trial to be continued past 2 years after the date of the first service of the summons.

4. The court shall determine, in a posttrial hearing, the award of interest and award as interest the amount of money which will put the person from whom the property is taken in as good a position monetarily as if the property had not been taken. The district court shall enter an order concerning:

(a) The date on which the computation of interest will commence;

(b) The rate of interest to be used to compute the award of interest, which must not be less than the prime rate of interest plus 2 percent; and

(c) Whether the interest will be compounded annually.

(Added to NRS by 1960, 421; A 1967, 816; 1979, 830; 1981, 1859; 1987, 940; 1991, 1642; 1999, 3534; 2007, 336)

# ATTACHMENT B

MINUTES OF THE
SENATE COMMITTEE ON JUDICIARY

Sixty-Fourth Session
April 8, 1987

The Senate Committee on Judiciary was called to order by Chairman Sue Wagner, at 8:00 a.m., on Wednesday, April 8, 1987, in Room 213 of the Legislative Building, Carson City, Nevada. Exhibit A is the Meeting Agenda. Exhibit B is the Attendance Roster.

COMMITTEE MEMBERS PRESENT:

Senator Sue Wagner, Chairman
Senator Erik Beyer, Vice Chairman
Senator Joe Neal
Senator Thomas J. Hickey
Senator Mike Malone
Senator Charles W. Joerg
Senator Herbert M. Jones

STAFF MEMBERS PRESENT:

Carol MacLeod, Committee Secretary

SENATE JOINT RESOLUTION 17 of the 63rd Session – Proposes constitutional amendments to require selection of judges by merit and retention by election.

Testimony of Senator Raggio, District One, Washoe County, Nevada

Senator Raggio read from prepared testimony expressing his support of SJR 17 of the 63rd Session (Exhibit C) and distributed a copy of a newspaper article supporting merit selection of judges (Exhibit D). In addition, Senator Raggio testified, "I think it is far better to have this procedure followed...we already have in place the judicial committee process to fill a vacancy and this would change that only to the extent that a vacancy would occur at any time when the judge failed to receive retention or failed to file for office...at that particular time the judicial selection process would come into play and the judge would serve the term indicated, and then stand for retention by the voters."

Senator Neal asked, "Where does this resolution allow the

you have to walk a rather fine line...."

SENATE BILL 45 - Requires interest on judgment to be paid at rate paid on United States Treasury bills.

Testimony of Senator Joerg

Senator Joerg testified S.B. 45 originated from an interim committee chaired by him on medical malpractice. He explained the bill attempts to provide some equity on the interest rate on judgments which are currently set in the statutes at 12 percent and felt a fluctuating interest rate would be more equitable. Senator Joerg said it would take away incentive for insurance companies to not settle or prolong cases because of the interest rate on judgments. Senator Joerg stated, "There has been some criticism...you received a letter from some justices in Reno about how they didn't have time to determine the rate. I would submit that takes about 30 seconds. All you have to do is have a Wall Street Journal and it (United States Treasury bills rate) is published every day...we chose this rate for no valid reason...there could be other methods...you could use prime rate, for example, and other indexes...the committee felt we should have a rate that fluctuates with market conditions...."

Senator Neal inquired about particular language in S.B. 45 which makes reference to United States Treasury bills as reflected in the Wall Street Journal. Senator Joerg explained, "The United States Treasury, every Monday, has an auction of 52 week treasury bills which means they mature 52 weeks later...where big financial institutions come and say how much they will pay the United States Treasury for that money...the average rate that occurs on that day is the rate we are talking about and every week that is published...." Senator Neal asked what was meant by "average price". Senator Joerg responded, "What actually occurs is there be, for example, 100 institutions who bid on treasury bills on Monday morning. The Treasury Department will take the highest bids...one may be for six percent, one may be for 5.95 and keep going down the line until they raise all the money they need...those numbers are averaged and published every Monday."

Bill Bradley, Nevada Trial Lawyers Association

Mr. Bradley testified, "We support the concept of the

fluctuating rate. We would be more in favor of a prime rate plus 2...the interest rate would run from service of summons of the complaint until the judgment is paid...we would obtain the prime rate out of the Wall Street Journal on the 31st day of January and 31st day of July...for the period the judgment is outstanding and that would be assessed upon payment of the judgment." Mr. Bradley said, "What we are addressing here is if we leave it (the interest rate) at 12 and the interest rate goes to 18 the insurance companies have no motivation to settle."

Testimony of Jack Barbash, Past President, Nevada Collector's Association

Mr. Barbash testified, "When an execution is taken down to the court, the balance has to be verified by the court clerk...they can't even figure the interest at one percent and we get into an argument over what the interest should be. When you start putting in a figure like 5 7/8 percent and you figure that for three months, and then it changes to 5.6 percent for the next three months, we are compounding the situation...the simpler we can get it, the easier it is going to be. I have no objection to lowering the interest rate...but let's keep it in a simple stature."

Testimony of Jim Wadhams, Nevada Insurance Association

Mr. Wadhams said his organization was in support of S.B. 45, and explained, "The reason we are in support of it is because a fixed rate of 12 percent is not particularly effective or fair in the long term. The current rate of interest that one would obtain if you were a normal borrower might be prime plus two or prime plus three...we support the concept of putting this on a scale that floats on the same basis that the person could have invested the money over that period of time." He stated Mr. Bradley and he had discussed the concepts and said, "Instead of the treasury bills...a reasonable concept might be prime interest rate plus two...the point is a fixed rate is unfair to one party or the other at some point in time and the floating rate would achieve some balance. The idea is the person should have the benefit of the money, or at least the interest the money could have earned...."

Senator Jones asked, "I presume, however, you are saying that the rates would be fixed at the time of the judgment and if it floats up or down, it is still the rate that was fixed at the time of the judgment...is that what you are saying?" Mr.

Wadhams replied, "That's what I have said so far...I should probably go one step further...that rate that would be on a normal commercial loan would be adjusted on a six month basis and we could prepare some language for the committee to look at so if you have a dramatic fluctuation in the interest rate you don't want to lock it in too low...that kind of concept could apply to the judgment interest rate as well and between the parties involved in a transaction, we think that could be handled fairly." Mr. Wadhams pointed out we support this concept because it should provide a fair return to the person who was entitled to the money, and not be a windfall or penalty either way.

Senator Neal asked, "Why should my judgment be based upon what the banks would lend me instead of what I would invest the money for?" Mr. Wadhams said, "There must be some standard that would apply across the board. To take an individual case by case situation, you are going to have both sides arguing with the judge...if the legislature sets a number...you eliminate the discussion of that issue and achieve some equity for the person who receives the judgment but hasn't been paid."

Senator Hickey inquired, "Why not use a high interest rate for not settling a judgment...after the dispute has been settled and a judgment determined?" Mr. Wadhams explained, "This interest rate goes back to the date the complaint was served on the other party...it doesn't go from the date of judgment until the cash is paid...." Senator Hickey asked, "Are you saying it is unfair the judgment going back to that date?" Mr. Wadhams replied, "I'm not prepared to say that." Senator Hickey said, "There is a notorious perception of the general public that the insurance industry withholds money because the amount of interest involved in it...money that could be used in other areas of investments...there is a reserve there used...I asked you again about the penalty, whether you feel it is unfair to have that penalty?" Mr. Wadhams said, "I understand your question...at the point the litigation is finally resolved...once it is over the money ought to be paid. That is a completely separate question than the relation back to the interest rate to the point the complaint was served...that is a separate policy question."

Testimony of Rick Pugh, Nevada State Medical Association

Mr. Pew testified his organization was in full support of the

1298
6

concepts of S.B. 45 whether treasury bills were used or prime plus a certain percentage.

Testimony of Madeline Shipman, Deputy Attorney General, Department of Transportation

Ms. Shipman said there was another bill, Assembly Bill 181, which has the same basic mechanism within it for determining interest rates on excess awards and condemnation and was requested by the department of transportation. Ms. Shipman explained, "The purpose of interest in litigation from a prejudgment point of view...is to place the property owner or the person who is seeking a judgment back in a status quo situation at the time the judgment is ultimately rendered." Ms. Shipman said the treasury bill rate generally represents something a little more than what a savings account or total no risk investment account would yield. She told the committee, "Normally it would be a sophisticated investor who would be getting a high rate of return...the treasury bill represents a rate a little above or above the standard savings account rate but less than time risk investment rate returns."

Senator Wagner asked Ms. Shipman, "You've heard three people testify...to a proposal, prime rate plus two percent. What are your views on that?" She answered, "Having heard that for the first time today, I'm not ready to represent the department...but I would say that in concept...the floating interest rate...would be supported by my client because that is the whole purpose of changing it." Ms. Shipman said she would like to see NRS 37.175 and whatever statute is being changed by S.B. 45 be the same. Ms. Shipman advised the committee federal law uses the treasury bill rate and was amended last November from six percent to a floating treasury bill rate on a yearly basis.

Senator Wagner requested Senator Joerg meet with the people who testified on S.B. 45 and report back to the committee.

SENATOR MALONE MOVED DO PASS SJR 17 of the 63rd Session

SENATOR JOERG SECONDED THE MOTION

THE MOTION PASSED UNANIMOUSLY

Senator Neal commented he was in favor of the measure but was concerned over the selection of commission members. Senator Hickey expressed concern over the evaluation of judges and

1299

SENATE BILL 45 - Requires interest on judgment to be paid on United States Treasury bills.

SENATOR JOERG MOVED TO AMEND AND DO PASS S.B. 45.

SENATOR HICKEY SECONDED THE MOTION.

THE MOTION CARRIED UNANIMOUSLY.

********************

SENATE BILL 270 - Revises provisions governing forfeiture of property related to criminal activities.

There was a general discussion by the committee regarding proposed amendments to S.B. 270.

Senator Neal stated his objection to S.B. 270, "This would allow the plaintiff, who is a law enforcement agency, to engage in the forfeiture of property where there has not been a conviction...the amendment is simply saying if a trial is pending then you can ask for a motion to say this particular action...this allows the police department...to go against property that they believe was used in the commission of a crime and have that property forfeited without proving up the crime."

Senator Hickey said the reason for the bill was if the police didn't take over the property, the federal government would. Senator Joerg agreed with Senator Hickey, but commented, "It essentially addresses Senator Neal's concern in that there is a mechanism provided, whereby action on the forfeiture is stayed until that conviction occurs."

SENATOR JOERG MOVED TO AMEND AND DO PASS S.B. 270.

SENATOR MALONE SECONDED THE MOTION.

THE MOTION CARRIED BY MAJORITY. (SENATOR NEAL VOTED NO).

********************

# ATTACHMENT C

$ 910,000.00 Reno, Nevada

June 8, 1978

After date, for value received, the undersigned promise to pay to the order of CONNECTICUT GENERAL LIFE INSURANCE COMPANY, at its Home Office at Bloomfield, Connecticut, or at such other place as the legal holder may from time to time designate, the sum of NINE HUNDRED TEN THOUSAND AND NO/100------------------------------------------------------------------------------- DOLLARS, in eighteen annual payments of EIGHTEEN THOUSAND TWO HUNDRED AND NO/100------------------Dollars, payable on the first day of February in each year, beginning on the first day of February, 19 80, and the final payment of FIVE HUNDRED EIGHTY-TWO THOUSAND FOUR HUNDRED AND NO/100--------------Dollars, payable on the first day of February, 19 98; with interest from June 9, 1978 on unpaid principal at the rate of 9-1/2 percent per annum payable annually on the first day of February in each year, beginning February 1, 19 79, and with interest at the rate of twelve (12%) percent per annum on any overdue installment of principal, or on the entire unpaid principal sum from the date when this Note matures, whether maturing by lapse of time or by reason of the failure of the maker hereof to pay any installment of interest or principal when due, or because of a default in the performance of any of the covenants contained in the Deed of Trust securing this Note.

If, in respect of any payment hereon, Maker shall tender to the holder of this Note a check, draft, money order, certified check, official bank check, or other negotiable or non-negotiable instrument, the acceptance thereof by the holder shall be provisional and subject to final payment without exchange to the holder in collective funds at its bank of deposit.

Privilege is granted of prepaying during the first ten years of the life of the loan, in multiples of $1,000.00, during any one year following the first anniversary of the date of the mortgage, on interest-paying dates, provided such prepayment, plus required payment, does not exceed 20% of the total principal amount disbursed. Such privilege shall be noncumulative. After the tenth year of the life of the loan, the loan may be prepaid in full on interest paying dates.

Both principal and interest shall be payable in lawful money of the United States of America with current rate of exchange on the City of New York.

If default be made in the payment of any installment of principal or interest, or any portion thereof, or in the performance of any of the terms or conditions of the Deed of Trust securing this Note, then all said principal sum remaining unpaid and the accrued interest thereon shall become at once (or at any time thereafter during the continuance of such default) at the election of the legal holder hereof, due and payable, without notice of such election. Failure to exercise such option at any particular time shall not constitute a waiver of the right to exercise the same at any other time.

All parties of this note, whether principal, surety, guarantor or endorser, hereby waive presentment for payment, demand, notice, protest and notice of protest and notice of dishonor. The makers, indorsers, and guarantors hereof and all others who may become liable for all or any part of this obligation consent to any number of renewals or extensions of the time of payment hereof. Any such renewals or extensions may be made without notice to any of said parties and without affecting their liability.

This Note is secured by a Deed of Trust of even date herewith executed by the undersigned, as Trustor to Title Insurance and Trust Company, as Trustee for CONNECTICUT GENERAL LIFE INSURANCE COMPANY, Beneficiary, conveying real estate situated in Nye County, Nevada.

The undersigned agree to pay all costs, charges and expenses, including a reasonable attorney's fee, incurred by the holder of this note incident to the collection of this note, or any portion thereof, or any interest thereon, or to enforce any rights hereunder or incurred in any litigation or controversy arising from or connected with this note, the same to be made a part of any judgment rendered in any action, or if no action is instituted the same to be paid upon demand.

This Note is to be governed by and construed according to the laws of the State of Nevada, and the undersigned hereby agree to pay all sums which may become due Trustee by reason of its services to be performed as Trustee hereunder.

E. Wayne Hage

Jean N. Hage

# ATTACHMENT D

When recorded mail to:
John S. Nichols
575 Ridge St.
Reno, Nv 89509

This document was recorded as Document No. 394268 on April 23, 1996 in Nye County, Nevada.

# AGREEMENT

THIS AGREEMENT is made as of and effective the 22nd day of April, 1996, by and between JOHN S. NICHOLS and BONNIE NICHOLS, hereinafter referred to as "NICHOLS", and E. WAYNE HAGE and JEAN N. HAGE, hereinafter referred to as "HAGE",

## WITNESSETH:

WHEREAS, NICHOLS has received by assignment the interest of holder and payee of that certain Promissory Note dated June 8, 1978 (hereinafter "Note") and the interest of the beneficiary in that certain Deed of Trust dated June 8, 1978, by and between E. WAYNE HAGE and JEAN N. HAGE, husband and wife, Trustors, TITLE INSURANCE AND TRUST COMPANY, Trustee, and CONNECTICUT GENERAL LIFE INSURANCE COMPANY, Beneficiary, recorded as File No. 67946, in the Official Records of Nye County, Nevada, at Book 219, Page 578, (hereinafter "Deed of Trust") which secures said Note; and

WHEREAS, the real property which remains as the collateral under the Deed of Trust is the subject of that certain litigation pending in the United States Court of Federal Claims, Hage v. United States, Case No. 91-1470L (hereinafter the "Litigation"); and

WHEREAS, HAGE and NICHOLS have reached the agreement set forth herein so that the interests of both parties hereto may be protected until the litigation is resolved;

NOW, THEREFORE, IT IS AGREED AS FOLLOWS:

1. NICHOLS hereby directs WESTERN TITLE COMPANY, INC., successor Trustee of the Deed of Trust, that the Notice of Default recorded October 11, 1995 as Document No. 381269, in the Official Records of Nye County, Nevada, be withdrawn and rescinded.

2. NICHOLS and HAGE ratify and reaffirm that any award of damages made in connection with any condemnation for public use of or injury to said property, or any part thereof, is subject to the assignment set forth in Article Fifth of the Deed of Trust, as more particularly set forth therein.

3. NICHOLS and HAGE hereby agree that the unpaid balance of the Note,

including interest, together with other unpaid obligations of the Note and the Deed of Trust equal $ 701,866.88, as of April 22, 1996. All accrued unpaid obligations other than principal shall be added to the unpaid principal, so that the unpaid principal balance owed under the Note and Deed of Trust as of April 22, 1996 is hereby agreed to be and is $ 701,866.88. The unpaid principal balance as hereby adjusted shall bear interest at the rate of nine and one-half percent (9 1/2%) per annum, simple interest, not further compounded, until paid. Hage shall have the right to fully or partially prepay the Note without penalty.

4. NICHOLS and HAGE hereby agree that notwithstanding the stated maturities and the due dates in the Note, all payments of unpaid principal under the Promissory Note and payments of interest on the unpaid principal balance of said Promissory Note shall be deferred until forty (40) days after the "Conclusion of the Litigation" and thereupon shall be due and payable in full. The Conclusion of the Litigation is defined as follows:

(a) The receipt of money damages or other consideration by HAGE as a result of the Litigation or any settlement thereof, or

(b) In the event that HAGE is not awarded money damages, then upon the final disposition of the Litigation, including the exhaustion or expiration of all appeal or other rights of judicial review.

5. It is understood and agreed that the full unpaid balance of the Note may be payable earlier or later than the stated maturity in the Note depending on the date which is forty (40) days after the Conclusion of the Litigation.

6. Except as expressly modified herein, all the terms and conditions of the Note and Deed of Trust shall remain in full force and effect and shall apply with full force and effect to the obligations and agreements set forth herein. For example, and not by way of limitation, HAGE remains obligated to maintain insurance and timely pay real property taxes on the subject property.

7. HAGE agrees to diligently prosecute the litigation.

8. NICHOLS and HAGE have requested that HOFFMAN, TEST & GUINAN serve as draftsman for this Agreement and have involved said attorneys in the negotiation of related Agreements. Each party has obtained independent advice related to all such transactions and Agreements to the extent they have deemed appropriate. NICHOLS and HAGE each consent to the conflicts of interest presented by the involvement of HOFFMAN, TEST & GUINAN in these transactions.

9. This Agreement inures to the benefit of, and is binding upon the heirs, successors and assigns of the parties.

IN WITNESS WHEREOF, the parties hereto have set their hands the day and year hereinabove set forth.

JOHN S. NICHOLS

BONNIE NICHOLS

E. WAYNE HAGE

JEAN N. HAGE

STATE OF NEVADA )
: SS.
COUNTY OF WASHOE )

On this 16th day of April, 1996, personally appeared before me, a Notary Public, JOHN S. NICHOLS personally proved to me to be the person whose name is subscribed to the above instrument, who acknowledged that he executed the instrument.

NOTARY PUBLIC

MOLLY SMITH
Notary Public - State of Nevada
Appointment Recorded in Washoe County
MY APPOINTMENT EXPIRES FEB. 10, 1997

STATE OF NEVADA )
: SS.
COUNTY OF WASHOE )

On this 16th day of April, 1996, personally appeared before me, a Notary Public, BONNIE NICHOLS personally proved to me to be the person whose name is subscribed to the above instrument, who acknowledged that she executed the instrument.

Molly Smith
NOTARY PUBLIC

MOLLY SMITH
Notary Public - State of Nevada
Appointment Recorded In Washoe County
MY APPOINTMENT EXPIRES FEB. 10, 1997

STATE OF NEVADA )
: SS.
COUNTY OF WASHOE )

On this 18th day of April, 1996, personally appeared before me, a Notary Public, E. WAYNE HAGE and JEAN N. HAGE, personally proved to me to be the persons whose name is subscribed to the above instrument, who acknowledged that they executed the instrument.

Gianna G. Ellis
NOTARY PUBLIC

GIANNA G. ELLIS
Notary Public - State of Nevada
Appointment Recorded In Washoe County
MY APPOINTMENT EXPIRES APR. 27, 1999